estate devised a legacy to a child, and it is in the same line not to be too ready to make the estate devised to them subject to a legacy to another not of the testator's kin."

We think that case is quite distinguishable from the one in hand.

Nor do we think Morris v. Sickly, 133 N. Y. 456, 31 N. E. 332, aids the contention of the appellant. In that case the will gave two money legacies, and then disposed of her residuary estate. At the time the will was made she owned no real estate, and a year afterwards she purchased certain real estate, and it was held that the legacies were not a charge upon the real estate. There were no words in the will directing a sale "to pay off the said legacies, and to make the proper division of my property as herein provided," which are found in the will before us.

Upon looking at Burns v. Allen, 89 Hun, 552, 35 N. Y. Supp. 342, it is found that there was no indication in the terms of the will of an intention to charge the legacies upon the real estate of the testatrix, and it was held that the extrinsic circumstances did not indicate an intention of the testatrix to charge the legacies upon the realty. We find nothing in the opinion inconsistent with the views stated here.

We reach the conclusion that the learned surrogate was right in determining "that the proceeds of the testator's realty, of which he directed a sale, as well as his personal estate, are applicable to the payment of the general legacies," and that "the money arising from the sale thereof became legal assets in the hands of the executor, when received by him, and for which, as such executor, he was bound to account as personal estate. The intent and direction of the testator to sell the land was absolute, or 'out and out' for all purposes" (Stagg v. Jackson, 1 N. Y. 212),—and that the surrogate had authority to construe the provisions of the will in determining their meaning and validity in order to make a decree of distribution (Purdy v. Hayt, 92 N. Y. 446; Garlock v. Vandevort, 128 N. Y. 374, 28 N. E. 599; Cahill v. Russell, 140 N. Y. 408, 35 N. E. 664; In re Bolton, 146 N. Y. 260, 40 N. E. 737; Baldwin v. Smith, 3 App. Div. 350, 38 N. Y. Supp. 299). The foregoing views lead to the conclusion that the decree of the surrogate's court should be affirmed.

Decree affirmed, with costs and disbursements allowed to respondent Emery against Peter Garlock personally, and with one bill of costs and disbursements in favor of respondents Clarence S. Vandevort and Gilbert M. Vandevort, payable out of the estate. All concur.

---

(8 App. Div. 360)

ROCHESTER & K. F. LAND CO. v. ROE.

(Supreme Court, Appellate Division, Fourth Department. July 30, 1896.)

1. EQUITY—ADEQUATE REMEDY AT LAW—PLEADING.
     The defense that plaintiff in an equitable action has an adequate remedy at law is not available unless it is pleaded.

2. SPECIFIC PERFORMANCE—DISCRETION OF TRIAL COURT—REVIEW.

The exercise of the discretion of the trial court in granting or refusing specific performance is reviewable on appeal, unless the rules governing such discretion have been followed.

Appeal from judgment on report of referee.

Action by the Rochester & Kettle Falls Land Company against John O. Roe. There was a judgment in favor of plaintiff, and defendant appeals. Reversed.

Action for specific performance of two contracts set out² in the complaint, executed by the defendant with one William C. Wait for the purchase, by the defendant, of three several lots,—one, lot No. 49 in block 29 in the Central addition to Kettle Falls, in Stevens county, state of Washington, for the sum of $500, payable in three equal installments of $166.66 each, bearing date the 20th day of November, 1890. The other contract was dated on the 29th day of November, 1890, and was for the purchase of lots 7 and 8 in block 16 in the Central addition to Kettle Falls, in Stevens county, state of Washington, for the sum of $800, payable in three equal installments of $266.66 each. On the first contract two installments of the purchase price of said lot had been paid, with accrued interest to May 20, 1891, leaving the last installment of $166.66, with interest from May 20, 1891, unpaid. On the second contract the first two installments of the purchase price of lots 7 and 8 were paid, with accrued interest to May 26, 1891, leaving the last installment of $266.66, with interest from May 26, 1891, unpaid. The referee finds that on the 10th of April, 1891, Wait, by two instruments in writing, assigned to the plaintiff all his right, title, and interest in and to the two several contracts aforesaid; and also finds that at the time of the execution of the contracts Wait had title to the land described in the contracts, and that on the 22d of February, 1892, by deed, he conveyed the same to George H. Smith, in whom the t.tle vested, and on the 25th of November, 1893, the plaintiff tendered to defendant a warranty deed of said three lots, executed by George H. Smith, and at the same time tendered the defendant a release of said lots from a lien of a mortgage thereon executed by the mortgagee, and offered to deliver them to defendant upon payment of the amount due on said contracts; that the defendant refused to accept such deed and release, or to make the payment due from him to the plaintiff under his said contracts. The referee found as conclusion of law: "(1) That the plaintiff is entitled to enforce against the defendant all the rights of said William C. Wait under the said contracts; * * * (3) that the plaintiff is entitled to judgment in its favor and against the defendant for the specific performance of the said two contracts by the defendant, and requiring the defendant to pay to the plaintiff the unpaid installments thereon, with accrued interest, together with the taxable costs of this action, upon the tender to him of the deed and release aforesaid. * * *" The defendant filed exceptions to the several conclusions of law stated by the referee. The plaintiff is a domestic corporation organized in September, 1810, at Rochester, under the Laws of 1848, and the acts amending the same, for the purpose of "purchasing, taking, holding, and possessing real estate and buildings, and selling, leasing, and improving the·same," with a capital stock fixed at $500,000, in shares of $100 each, with 13 trustees. Soon after its organization it purchased for its said purchasers 905 acres of land at Kettle Falls, upon the Columbia river, in the state of Washington. Defendant, in his answer, admits that he executed two contracts, copies of which are annexed to the complaint, and marked "Schedule A" and "Schedule B," and he alleges that shortly prior·to the execution thereof the defendant entered into an agreement with the plaintiff, through its officers and agents, whereby the company agreed to sell the defendant the building lots described in said contracts, and he alleges that he has paid on the lots $533.33, and that the lots were sold to the defendant by the plaintiff "through said Aris, Ranger, and Morley, and others of its officers, managers, and agents, who represented to defendant that this plaintiff owned said property and lots, and defendant knew nothing of said Wait, or that he held the titles to the lands of the plaintiff, until after defendant had agreed to buy said lots, and when the con-

tracts were presented by said plaintiff for execution." The answer also alleges that: "In the year 1890 one John W. Goss, in connection and associated with William B. Aris, Harvey Hoag, W. H. Dick, L. C. Huber, Charles W. Robinson, George S. Morley, and others, obtained the option upon a tract of uncultivated, wild, and forest lands situated in Stevens county, in the state of Washington, for the purpose of converting said lands into a town site, and dividing them into building lots, and with the view of organizing and promoting a stock company at Rochester, N. Y., for developing and selling of the same. That said tract of land consisted of about 1,000 acres, and was purchased through said Goss for about the sum of $25,000. That on or about the 20th day of October, 1890, said John W. Goss and Flora A. Goss, his wife, purported to sell said tract of land to said Charles W. Robinson, for the sum of $135,750, and executed a deed of said lands to said Robinson, and said Robinson thereupon executed to said Goss in return a mortgage upon said land in the sum of $105,750, and it was agreed between them that $30,000 of said purchase price was to be paid in money, and said deed and said mortgage were thereupon recorded in said Stevens county, state of Washington, and the name adopted by said promoters for said lands and town site was Kettle Falls, and said town site has since been known by that name. * * * That on or about the 22d day of October, 1890, said Rochester & Kettle Falls Land Company, through said Aris, Dick, Hoag, Robinson, Goss, and others, purported to purchase said tract of land at Kettle Falls of said Goss for the sum of $450,000, as appears by the minutes of the secretary of said company, and said purchase price consisted of the mortgage on the property of $105,750, and capital stock of the company to the amount of $300,000 was to be paid to said Goss and others, and the balance of about $40,250 was agreed to be paid in money. That said lands were purchased by said company upon the above conditions, and in order to carry out said purchase said Goss, through said Charles W. Robinson, on or about the date aforesaid, executed and delivered a deed of said lands to one William C. Wait, subject to said mortgage, said company assuming said mortgage, and said Wait was designated by said company, by resolutions of its directors, to hold the title to said lands, for the reason that said company, being a corporation, could not legally hold title to lands in the state of Washington; and that said plaintiff has not at any time held the title to said lands, or any part thereof, and has not acquired through said Wait or otherwise a clear and merchantable title to said lots in question, or to said lands, or any portion thereof." The answer enumerates several false and fraudulent representations alleged to have been made "for the purpose of inducing people generally, and this defendant in particular, to purchase lots, and did induce this defendant to make the purchases aforesaid." The answer further alleges that the lands, at the time they were purchased by the plaintiff, were not worth the amount said promoters agreed to pay for them, "and have not since been worth that amount, nor are said lands worth more now than the mortgage upon them of about $28,000, and said lands have no value other than that of ordinary wild and uncultivated land in the state of Washington." It is also alleged that the plaintiff ceased to develop or improve said lands, and what improvements had been made were allowed to fall into decay, "and the few people and settlers who have located in said town, owing to the desertion of said enterprise by this plaintiff, are rapidly leaving and deserting the same." The answer further alleged, viz.: "That said plaintiff represented to the purchasers of lots, and to this defendant in particular, and agreed with said plaintiff, through its directors and managers, that the schedules of prices for lots fixed by said company at the time this defendant purchased said lots were to be maintained by the company until its lots were sold; while, on the other hand, said company, soon after this defendant purchased said lots, entered into fraudulent arrangements with its directors, whereby special prices and enormous discounts were given its directors and said promoters, and said company entered into a further fraudulent contract with certain of its directors and said promoters, who formed a syndicate called and known as the 'Northwestern Investment Company,' to which company this plaintiff sold a large portion of its highest-priced lots at a small percentage of the schedule prices of said lots, thereby enabling said purchasers to offer lots at prices far below the price agreed to be paid by this defendant.

v.40N.Y.S.no.6—51

* *· * That said Wait, who held the title to said lands for the plaintiff, was one of its promoters, and also its secretary (and a member of said fraudulent syndicate, said Northwestern Investment Company), and at all times acted as the agent and representative of said plaintiff; and that said George H. Smith, to whom it appears said Wait transferred the title to said lands for said company, has since said transfer been a director and officer and manager of this plaintiff. That the contracts upon which this action is brought were at the time they were executed the property or said company, this plaintiff, and have at all times belonged to this plaintiff, and that said Wait was said plaintiff's agent in taking said contracts; and that this defendant on divers occasions prior to the beginning of this action, demanded of this plaintiff that said contracts be rescinded, and that he be relieved from the obligations under the same. That the facts above stated as to the fraudulent management, dealings, and representations of said plaintiff were not known to this defendant until after he had made the payments aforesaid upon said contracts."

Argued before HARDIN, P. J., and FOLLETT, ADAMS, WARD, and GREEN, JJ.

Charles Roe, for appellant.
James G. Greene, for respondent.

HARDIN, P. J. Newton v. Bronson, 13 N. Y. 587, holds that the supreme court may compel the specific performance by a resident of this state of a contract for the conveyance of land lying out of its jurisdiction; and numerous cases are cited in support of the proposition by Denio, J., at page 591 in the opinion. That case was cited and approved in Gardner v. Ogden, 22 N. Y. 339. The power to enforce the specific performance of a contract was asserted and exercised in Land Co. v. Davis, 79 Hun, 69, 29 N. Y. Supp. 1148. In Tucker v. Railway Co., 78 Hun, 442, 29 N. Y. Supp. 202, it was held: "A defendant in an equitable action cannot avail himself of the defense that the plaintiff has an adequate remedy at law, unless it is pleaded in the answer;" and numerous cases are cited in support of the proposition. In Railroad Co. v. Johnston, 84 Hun, 90, 32 N. Y. Supp. 49, the rule was reasserted, and it was said, viz.:

"This rule simply prevents the defendant from availing himself as a matter of right of the existence of the defense that the plaintiff has an adequate remedy at law. When the defendant has failed to interpose this defense, and the trial court refuses to dismiss the equitable action on that ground, the refusal cannot be urged by the defendant as error on appeal. But the trial court may, in its discretion, dismiss an equitable action on the ground that the plaintiff has an adequate remedy at law, though the defendant failed to interpose that defense, but, since legal and equitable remedies have been administered in the same court, this discretion has seldom been exercised."

The answer in the case in hand does not contain a defense that the plaintiff has an adequate remedy at law. And therefore, according to the doctrine laid down in Railroad Co. v. Johnston, supra, if the trial court refused to dismiss the action on that ground, "the refusal cannot be urged by the defendant as error on this appeal."

Upon the hearing before the referee a question for the exercise of judicial discretion as to whether there should be a specific performance of the contracts alleged in the complaint was presented for determination.

In Margraf v. Muir, 57 N. Y. 158, it was said:

"When a contract for the sale of lands is fair and just and free from legal objection, it is a matter of course for courts of equity to specifically enforce it. But they will not decree specific performance in cases of fraud or mistake, or of hard and unconscionable bargains, or when the decree would produce injustice, or when such a decree would be inequitable under all the circumstances,"—citing 2 Story, Eq. Jur. § 769; Will. Eq. Jur. § 262; Osgood v. Franklin, 2 Johns. Ch. 1, 14 Johns. 527; Seymour v. Delancy, 6 Johns. 222, 3 Cow. 445.

In Sherman v. Wright, 49 N. Y. 231, it was said:

"The specific execution of a contract in any case is a matter not of absolute right, but of sound discretion in the court. * * *"

In Miles v. Iron Co., 125 N. Y. 294, 26 N. E. 261, it was held:

"The right to a specific performance of a contract by the decree of a court of equity rests in judicial discretion, and may be granted or withheld upon a consideration of all the circumstances."

It is said in section 233 of Fry on Specific Performance, viz.:

"There are many instances in which, though there is nothing that actually amounts to fraud, there is nevertheless a want of that equality and fairness in the contract which, as we have seen, are essential in order that the court may exercise its extraordinary jurisdiction in specific performance."

The same learned author says (section 255) viz.:

"It cannot, however, be denied that there are cases in which the court has refused its interference by reason of events subsequent to the contract."

And again the same author says (section 256):

"Where the subsequent events alleged for this purpose are acts of the plaintiff himself, or events in some sense within his power, the court may have regard to them in exercising its discretionary jurisdiction in specific performance."

When the defendant entered into the contracts with Wait for the purchase of the lots, it is quite evident that the plaintiff was the beneficiary of the title. Land Co. v. Davis, 79 Hun, 69, 29 N. Y. Supp. 1148.

In the fourth and fifth subdivisions of the contracts is inserted the following language, giving options to the vendor, viz.:

"(4) It is expressly agreed that time is the essence of this contract, and in case default shall be made by the party of the second part, his heirs or assigns, in any of the conditions above stipulated to be performed by him, then, and in that case, this contract shall become void, and the party of the second part have forfeited his rights hereunder, and any payments that shall have been made shall become forfeited to the party of the first part, as well as all buildings or other improvements upon said premises, which said payments and improvements and buildings it is hereby especially agreed shall in that case be deemed as damages hereby liquidated for the nonperformance of this contract by said second party. (5) Nothing herein shall be construed to entitle said second party to possession of said premises until the delivery of a deed therefor, as herein provided."

The evidence does not indicate that the defendant ever had possession of the lots in question, or that he ever derived any benefits from or under the contracts. The land was forest land, covered with timber, which was expressly reserved to the vendor by the insertion in the contract of the following language:

"The party of the first part reserves all of the merchantable timber now standing upon said premises, with the right to enter upon said premises, and cut and remove the same."

The language is so broad that it does not seem to limit the time within which the removal shall be made. According to the testimony of the defendant, his negotiation for the lots was with Aris and Ranger, who were connected with the corporation, and they represented to him that the "company owned this tract of land," and the defendant did not learn that the title was in Wait until the contracts were made out and presented to him to sign, and then the officers of the company "explained that it was done in order to comply with the law, which prevented a corporation from owning lands there, and the title had to be vested in one person's name." He further testified:

"There was a great deal said about the value of the property. They described the property to me as having been laid out into streets, and cleared off, and a great many stores going up there already, and that it was quite a large town at that time, and growing very rapidly, and the property was increasing in value; that there was a water power, which was a valuable adjunct to the town, and that there were valuable mineral deposits near the town. They said that one of the main trunk line railroads run near Kettle Falls, and that arrangements had already been made with the road to run a branch into Kettle Falls. They said that a ferry was to be constructed across the river, and that they were going to have a courthouse right away, and a large school building was to be built, and that it would be a city in a very short time. All the public improvements, laying out the streets, putting in the ferry across the river, and utilizing the water power there. They said they proposed to have electric lights in a short time, and that the streets would be paved. * * * They said the schedule prices of the lots would not be any cheaper than they were at that time. Mr. Aris stated to me that the schedule prices would be increased."

Harvey Hoag was called as a witness for the defendant, and he testified to the organization of what was known as the Northwestern Investment Company, composed of several of the directors of the plaintiff; and the referee refused to allow him to state how lots were selling prior to the organization of the investment company, and an exception was taken to the ruling. The witness stated that he had knowledge that lots were sold prior to the formation of the investment company, and he adds: "It was understood by the directors that the prices should be maintained." And he states that no lots were sold after the organization of the investment company. The witness stated further: "I think they were sold at all prices, without regard to schedule or anything." Upon motion of the plaintiff's counsel that was stricken out, however, and an exception was taken by the defendant. It appeared by the evidence that Aris occupied the position of general manager and treasurer of the plaintiff, and was one of its directors and trustees, and that he was a member of the first board of directors, and he continued so throughout the year. It was shown by the evidence that Robinson, Aris, and Morley belonged to the Northwestern Investment Company. That company purchased a large number of the lots "at a price far below the schedule prices." The evidence of the witness Roe on that subject, however, was, on motion of the plaintiff, stricken out, and an exception was taken by the defendant. It seems that all but two of the directors were members of the Northwestern Investment Company, and Wait became secretary of that

company, and it purchased from the plaintiff 350 lots at $150 per lot, and payment therefor was made by crediting it on the $105,000 mortgage.   It was not an incorporated company.   It was a partnership or "syndicate."   All of its members were stockholders of the plaintiff, except one.   Some evidence was given tending to show that there was an arrangement among the board of directors prior to the organization of the investment company, by which special discounts were allowed to the directors.   According to an entry made in the journal of the plaintiff under date January 23, 1891, the sale of the 350 lots was authorized by resolution adopted December 11, 1890, for $35,000.   There appears an entry also in the journal of that date, viz.: "Mr. Morley represents a syndicate of buyers, for which he acts as secretary.   All the papers are only just being sent for record.   The sale was consummated and lots selected Dec. 15th, 1890."   On the following pages of the journal "are the numbers and designation of the lots sold to the syndicate."   It appears in the evidence that the plaintiff brought an action against the investment company, claiming some $100,000, for fraud in the sale of the investment company.   That suit, however, was subsequently discontinued, and the appeal book does not indicate very clearly how it was disposed of.   In the complaint in the action brought by this plaintiff against the syndicate is found an allegation: "That when it became generally known that such a syndicate existed, the public faith in this plaintiff and its said enterprise was greatly impaired, and the value of said real estate depreciated, and this plaintiff was greatly damaged in consequence."

From the facts and circumstances which we have already quoted, as well as others appearing in the case, we are of the opinion that the learned referee fell into an error when he reached the conclusion that, according to the principles of equity, a proper case was made out for the enforcement of the contracts.   Stokes v. Stokes, 148 N. Y. 764, 43 N. E. 211.   It is contended, however, by the learned counsel for the respondent, that "the propriety of specific performance is a matter for the discretion of the trial court unreviewable on appeal"; and he calls our attention to Kelso v. Lorillard, 85 N. Y. 184, where the remark was made in the course of the opinion by Miller, J., viz.:

"It may also be remarked that this was a matter within the province of the court below to determine, and the exercise of its discretion in this respect should not be disturbed unless clearly wrong."

We think that that does not militate against the discretion of this court to review the discretion of the trial court.   Attention is also called to Dunckel v. Dunckel, 141 N. Y. 434, 36 N. E. 405.   In the course of the opinion there delivered it was said:

"There is a further rule that the specific performance of contracts rests largely in the discretion of the equity courts; not wholly, but in a discretion to be governed by rules which have become established for the guidance of such courts.   That, again, is a rule to be generally administered in the equity courts.   So far as they exercise their discretion, violating no fixed rules of equity, such discretion is not reviewable here."

That case falls far short of the position claimed by the respondent in the case in hand.   We think some of the rulings made by the

learned referee, which have been incidentally referred to, were some-what doubtful. However, as the views we have already expressed lead to a reversal, we need not protract this opinion to discuss them.

Judgment reversed, and a new trial ordered, with costs to abide the event. All concur.