(32 App. Div. 529.)

BUFFALO & L. LAND CO. v. BELLEVUE LAND & IMPROVEMENT CO.

(Supreme Court, Appellate Division, Fourth Department.  July 26, 1898.)

CONTRACT—PERFORMANCE—SUFFICIENCY.

On a sale of suburban real estate, a company holding a purchase-money mortgage thereon, agreed to build by a certain date, and operate, a suburban street railroad,—cars to be run daily at certain specified hours until the land was sold; and for a breach of its agreement it agreed to cancel the mortgage debt, take back the land, and reimburse the purchaser, and pay him $5,000 as liquidated damages. At an outlay of $150,000, it built the road, and strictly performed its agreement, except that during the winter of 1894–95 its service was interrupted by heavy snow blockades. It used all the means usually employed to keep its track clean, and operated the road as well as others in the vicinity were operated, and the purchaser sustained no loss thereby. *Held*, that the failure was a breach not contemplated by the agreement, and a forfeiture could not be enforced against the company.

Follett and Green, JJ., dissenting.

Appeal from special term, Erie county.

Suit by the Buffalo & Lancaster Land Company against the Bellevue Land & Improvement Company for specific performance. Decree for plaintiff (47 N. Y. Supp. 721), and defendant appeals. Reversed.

In June, 1892, the defendant entered into an agreement in writing with Charles L. Woodbridge and others for the sale to them of certain lands situated in the town of Lancaster, Erie county; being parts of lots 94 and 95, township 10, range 6, of the Buffalo Creek Indian reservation. In February, 1893, Charles L. Woodbridge and his associates organized the Buffalo & Lancaster Land Company (the plaintiff), a domestic corporation, for the purpose of buying, selling, leasing, mortgaging, and otherwise acquiring and disposing of land, and for certain other speculative purposes. Thereafter the defendant conveyed the land described in the complaint to Woodbridge and others by a deed bearing date the 22d of May, 1893, which was recorded on the 27th of June, 1893.  Woodbridge and his associates executed a bond, and a mortgage collateral thereto, which mortgage was in the sum of $55,580, to the defendant, bearing date the 31st of May, 1893, which mortgage was recorded the 22d of June, 1893.  On the 31st of May, 1893, Woodbridge and his associates conveyed the land to the plaintiff by a deed bearing date the 31st of May, 1893, recorded on the 29th of June, 1893, which deed seems to have been delivered in consideration of the capital stock of the plaintiff.  In March, 1893, a second contract was executed by the defendant, which is referred to in the complaint.  That contract recites that the plaintiff was about to take a conveyance from Woodbridge and his associates of the said land; and it refers to the agreement of June, 1892, and contains the following language: "That in consideration of the premises, and the sum of one dollar paid by the party of the second part to the party of the first part, and for other good and valuable consideration, the party of the first part agrees, in case the parties to said agreement of the second part shall make the conveyance hereinbefore recited, that an electric street railroad shall be constructed, maintained, and operated, connected with the street-railroad system of the city of Buffalo, and running thence to the village of Lancaster, and that the said railroad shall run over said land, and in and along a certain street or highway one hundred feet wide, as the same is now located, which street or highway runs in a direction parallel, or nearly parallel, to the northerly line of said land; that said street railway shall be completed and in operation on or before the first day of May, 1893; that said street railway shall be maintained in good condition and in operation until the said land shall be sold by the party of the second part, and that, after the completion of said railroad, cars shall be run thereon for the convenience of passengers as often as once every half hour from 7 a. m. to 8 p. m. of each day, as such street railroads are usually run, until said land is sold.

The party of the first part further covenants that in case said street railway shall not be constructed, maintained, and operated as hereinbefore provided, the said party of the first part will, at the request of the party of the second part, take back the said land, provided said land shall be free and clear from all liens and incumbrances except a mortgage made by the parties to said agreement, of the second part, to the party of the first part, to secure the payment of the sum of fifty-five thousand five hundred and eighty ($55,580.00) dollars. * * * And thereupon the party of the first part will repay to the party of the second part all money which has or may be paid to the party of the first part pursuant to the terms of the said agreement, and all moneys which may have been paid on said mortgage, or the bond to secure which the same is given, and all money which may have been paid on account of taxes or assessments levied or assessed upon said premises since the first day of June, 1892, and will pay to the party of the second part the further sum of five thousand ($5,000.00) dollars, which it is hereby agreed shall be full liquidated damages for the breach of the foregoing covenant for the construction, maintenance, and operation of said street railway; and the party of the first part will thereupon, at the request of the party of the second part. discharge said mortgage." Plaintiff's complaint, after setting out the contracts stating the leading facts already mentioned, and some others, demanded julgment for the sum of $35,572.16, with interest from the 10th of October, 1896.

The answer of the defendant, among other things, sets up that the land was and is "wholly unimproved and unoccupied, and has had no person or persons residing thereon, or desirous of riding in said cars; and that the winter of 1894 and 1895, and the month of March, 1895, being the times mentioned or referred to in the said complaint, were uncommonly and unusually severe, and large and unusual and uncommon bodies of snow during said alleged months covered the said land and said railway, and the same were blown and drifted over and upon said railway to great depths, and to about the depth of from three to five feet; and the said defendant was unable, by all the exertions it could make, or by such exertions as were made to clear other street railways in the county of Erie, and which efforts it did make, to clear said railway from said snow and snowdrifts, and was unable, while said snow and snowdrifts continued, to run its cars on or over said railway; and said defendant in good faith endeavored, by its apparatus and appliances which it during all the said time supplied and provided for that purpose, and which were the same as were usually supplied and provided by other street railways in said county, to clear said railway of said snow and snowdrifts to the extent that would permit and render it possible to run said cars over the said railway, and it was not possible so to do; and when the said drifts were partially cleared the winds carried the snow into them again in such quantities as to completely blockade the said railway, and render the same impassable; and the said defendant, in its said efforts and endeavors to open and clear said railway, broke and disabled its motor power on its said cars, and was unable to obtain other motor apparatus to replace those so broken and disabled, although it in good faith endeavored speedily so to do; and it was by reason and means of the said obstruction of the said railway, and the inability to remove the snow and snowdrifts, or to keep the same removed, that its cars were not continuously run, and were prevented from being so run, over said railway; and during the only days in December, 1894, and January, February, or March, 1895, when said cars were not run on the said railway, they were prevented from running, and this defendant was prevented from running them, on the said railway, by the causes aforesaid, and not otherwise."

The issues were brought to trial at a special term, and the learned judge who presided at that term treated the action as one on the equity side of the court. At the commencement of the opinion delivered by him, he said: "This action was brought for the purpose of compelling the defendant to a specific performance of the alternative covenants of a contract, upon the ground that the party was in default, and that it had failed to perform certain specific covenants going to the essence of the contract." The relief which the trial judge authorized indicates that throughout he treated the action as one on the equity side of the court.

The fourteenth finding of fact is as follows: "Fourteenth. That the said Bellevue Land & Improvement Company constructed, or caused to be constructed, an electric street railroad, connected with the street-railroad system of the city of Buffalo, running thence to the village of Lancaster, and running over the land mentioned in the said deed and mortgage, and in and along a certain street or highway one hundred feet wide, as the same was located on the 21st day of June, 1893, which street or highway runs in a direction parallel, or nearly parallel, to the northerly line of said land; that said street railway was completed and in operation on or before the first day of May, 1893; and said railroad has been maintained in good condition ever since that time, and has been operated to the time of the trial of these actions, except during the winter of 1894-95, as hereinafter found."

The fifteenth finding of fact is as follows: "Fifteenth. That during the whole or a substantial part of the period elapsing from December 1, 1894, to April 1, 1895, cars were not run on the said electric street railway as often as once every half hour from 7 a. m. to 8 p. m. of each day, and that during said period there was a substantial failure to run cars on said electric street railway on the days and at the times and intervals required by said contract set forth in the above ninth finding of fact; that the winter of 1894 and 1895 was of unusual severity, and the failure to run said cars over or on said railroad as aforesaid was caused and resulted from said railroad becoming blockaded with snow and snowdrifts, caused by heavy snowfalls and high winds, rendering it practically impossible to run cars over said railroad while the said snow and snowdrifts continued on the said railroad; and the same were removed from said railroad with the appliances and assistance usually and ordinarily employed for that purpose by street railroads, and when the same were so removed from said railroad the running of cars was resumed and continued,—a car passing over said railroad once every half hour until the railroad became blocked again in the manner hereinbefore set forth."

It appears by the evidence that the plaintiff did not learn of the facts mentioned in the two findings which we have just quoted until the month of October, 1896; and such fact is found in the nineteenth finding, and that in that month it requested the defendant "to take back" the land mentioned, and to pay to the plaintiff $35,572.10, being the amount alleged to have been paid. It is found that none of the land has been sold by the plaintiff, or in any manner improved, since the making of the contract of March, 1893, and that the land is vacant and unoccupied, having no buildings whatever upon it.

The twentieth finding of fact is as follows: "Twentieth. That it was practically impossible for the said Bellevue Land & Improvement Company to operate the said electric street railway during the winter of 1894-95 pursuant to the terms of the agreements dated June 1, 1892, and March 1, 1893, and referred to in the above second and ninth findings of fact." It was also found that there has been no market since 1893 for said property, "and its salability, under the existing conditions, does not appear to have been affected by such interruptions in the operation of said street railroad; and during the winter and early spring of 1894 and 1895 no person was shown by the evidence to have gone to or upon said land, or any part thereof, to observe or examine it, or with the intention of buying it or any part of it; and no damage appeared by the evidence to have been caused to any person interested in said lands by the failure of the Bellevue Land & Improvement Company, or the company owning or engaged in the operation of said street railroad, to run cars on said railroad when it was obstructed or blocked with snow or snowdrifts, or when the cars had been disabled by the exertions made to run them on said railroad; and such interruptions as there were to the operation of said street railroad during the month of December, 1894, and the months of January, February, March, and April, 1895, were not due to any act or omission on the part of the said Bellevue Land & Improvement Company, or the company owning or engaged in the operation of said street railroad, but were due to the heavy storms which prevailed at the time of such interruptions."

The twenty-second finding of fact is as follows: "Twenty-Second. That the said electric street railroad agreed to be constructed by said Bellevue Land & Improvement Company was completed during the early part of April, 1893,

and has been in operation until the time of this trial, except during the winter of 1894–95, as found in the above fifteenth finding of fact, and is known as the Buffalo, Bellevue & Lancaster Railroad."

It is found that from the completion of the road down to the time of the trial the defendant has maintained a power house for the purpose of supplying electric power to run and operate cars on the said electric road; "that the said power house was so constructed and maintained, and was supplied with the machinery to produce more power than was required to propel the electric cars over said railroad every half hour from 7 a. m. to 8 p. m. of each day when the said railroad was not obstructed or blocked as hereinbefore stated; and that a repair shop was there maintained by the said Bellevue Land & Improvement Company, with a sufficient and competent number of qualified men to repair said cars whenever any of them became disabled; and that the said company during the said winter and spring of 1894 and 1895, at same power house, supplied duplicate parts of the apparatus of its cars as were liable to be disabled, for their repair, whenever said apparatus was needed, and during the fall of 1894 contracted with an establishment in the best standing at Schenectady, engaged in the manufacture of electrical apparatus for operating cars on electric railways, for additional motors of double the ordinary power, and the same were received by the said Bellevue Land & Improvement Company at said power house from early in January, 1895, from time to time, and were placed on its cars and snowplows, the more effectually and surely by their weight and impact to run the said electric cars over said railroad, and to remove the snow and snowdrifts therefrom; and, from the time the said cars were so supplied with said increased power motors, they were so used and employed, as such cars were used on other street railroads, to clear said railroad of snow and snowdrifts, and to force their way through drifts of three to five feet depth; and said cars frequently became disabled by such use, by the motors and armatures burning out, and when they were taken to such shop for repair, and repaired with all practicable diligence, and were then placed upon said railroad for use; and besides the two snowplows in the use of said company during the winter of 1893 and 1894, and the early part of the winter of 1894 and 1895, to clear the said railroad of snow and snowdrifts, and enable it to run its cars thereon, a much more powerful and effectual snowplow was manufactured by and for such company, and used upon said railroad from the middle of February, 1895, in removing the snow and snowdrifts from such railroad; and the men employed by said company, including those operating its cars as motormen and conductors, were also employed shoveling the snow from the drifts on said railroad; and each car had an apparatus of its own, to be, and was, applied by the motorman to clear said railroad rails. The said men and said snowplows were employed in the daytime and the nighttime in opening snowdrifts blown upon said railroad, and in cleaning the same for use by the electric passenger cars, a larger number of which cars were provided for the use of said railroad than were required to run one of such cars over said railroad once every half hour from 7 a. m. to 8 p. m. of each day, when said railroad was so cleaned of snowdrifts as to enable the said cars to run on said railroad; and they were so run by said company while said railroad was so kept open as to permit them to be run or operated on said railroad, and they were so run whenever the snowdrifts on said track permitted them to be run. And other electric railroads extending from the city of Buffalo into the open country were obstructed and blocked with snow and snowdrifts during the winter of 1894 and 1895, which prevented cars from being run on such electric street railroads while such railroads were so obstructed and blocked, and the means taken to open such railroads and remove the snow and snowdrifts therefrom were a snowplow, or plows, men engaged in shoveling, and efforts made to run the cars through the snow and snowdrifts, by which the motors of cars were burned out and cars were disabled; and said efforts resulted in opening such railroads only for short periods, when the railroads would be again blocked with drifts of snow, preventing the cars from being run upon them, and the cars were run upon said railroads only when they were so kept clear of snowdrifts. And during the winter and spring of the year 1893 and 1894 the said two snowplows first in use, and the electric cars, with one-half the motor power

supplied to them during the latter part of the winter of 1894 and 1895, and no larger force of men, were able to, and did, keep said railroad clear of snow and snowdrifts during the winter of 1893–94, so as to permit said electric cars to run over said railroad every half hour of each day from 7 a. m. to 8 p. m., excepting about one hour detention during that time."

"Twenty-Fourth. That from the opening of said railroad, in the early part of April, 1893, until the trial of this action, the said Bellevue Land & Improvement Company has supplied a number of electric cars for the carrying of passengers thereon, each of which cars was supplied with the usual motor used on street-railroad electric cars.

"Twenty-Fifth. That from the early part of December, 1894, to about the middle of March, 1895, the weather at various times was cold and windy, and large snowfalls occurred from time to time during said period, and the snows were blown in drifts on portions of said electric railroad; and said drifts were at times, and in some places, from five to ten feet deep, and, when not removed, prevented and obstructed the regular running of said electric cars over and upon said railroad."

"Twenty-Seventh. That when said railroad was opened, by the clearing of snow therefrom, the running of said passenger cars thereon was resumed by said Bellevue Land & Improvement Company, and continued until again interrupted by snowdrifts upon portions of said railroad track."

It is found that some of the passenger cars in the winter of 1894–95 became disabled "by endeavors and efforts made to force such passenger cars through the snowdrifts, and the electric motors therein were at different times burnt out, and the cars thereby disabled and rendered useless until they could be and were repaired." A repair shop was maintained and supplied, with duplicate apparatus to be attached to disabled cars, "and during the latter part of said winter of 1894–95 provided heavier motors to be placed upon and used upon some of said passenger cars."

"Thirty-First. That said street railroad was run during the month of December, 1894, and the months of January, February, March, and April, 1895, as similar street railroads in the vicinity of Buffalo were run during that period."

The thirty-fifth finding of fact is as follows: "Thirty-Fifth. The defendant in action No. 1 and the plaintiff in actions Nos. 2, 3, 4, and 5 having requested the court to find as a fact that there was substantial performance by it of the agreement which is referred to in the ninth finding as 'Exhibit 2,' as to the construction, maintenance, and operation of such electric street railroad, the court declines so to find as to the operation of the same, but finds that there was not substantial performance of said agreement as to the operation of said electric street railroad."

The third conclusion of law is as follows: "Third. That the phrase in the agreement of March 1, 1893, 'as such railroads are usually run,' does not limit or modify or excuse the performance of the covenant therein contained, 'that after the completion of said railroad cars shall be run thereon for the convenience of passengers as often as once every half hour from 7 a. m. to 8 p. m. of each day.'

"Fourth. That, by reason of the failure to operate said street railway as aforesaid, there has been a substantial breach of agreements of June 1, 1892, and March 1, 1893, on the part of the said Bellevue Land & Improvement Company.

"Fifth. That the difficulty or impossibility of the performance by said Bellevue Land & Improvement Company of said agreements of June 1, 1892, and March 1, 1893, constitutes no excuse for its failure so to perform."

"Ninth. That the said Buffalo & Lancaster Land Company is entitled to recover from said Bellevue Land & Improvement Company the liquidated damages prescribed by the agreements dated, respectively, June 1, 1892, and March 1, 1893."

Judgment was ordered canceling the bond and mortgage already mentioned, and ordering a recovery in favor of the plaintiff for $37,383.63, with interest from October 10, 1896, and that upon such payment the plaintiff deliver to the defendant the deed of conveyance of the premises described in the said

mortgage, which deed was heretofore tendered and offered in evidence on the trial; and the defendant was ordered to surrender and deliver up to the plaintiff said bond and mortgage, and to execute any further instrument that may be necessary to carry the judgment to be entered into effect. The decision also dismissed the complaint in actions Nos. 2, 3, 4, and 5 upon the merits, and held that none of the defendants in those actions "are personally liable to the said Bellevue Land & Improvement Company in any event, in any sum whatever, and that each of the defendants in said actions be forever discharged from any liability to the said Bellevue Land & Improvement Company, and that the defendant, said Buffalo & Lancaster Land Company, in each of said actions recover the costs of said actions, respectively, against the said Bellevue Land & Improvement Company,—that is to say, one bill of costs in each of said actions,—and have execution therefor in each of said actions." And a separate judgment in the five actions was directed to be entered upon filing the decision.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN, and WARD, JJ.

John G. Milburn, for appellant.
Simon Fleischmann, for respondent.

HARDIN, P. J. Manifestly, this action is for specific performance of the agreement set out in the complaint, and was so treated by the parties and the trial court. Upon all the proofs and allegations of the parties, a question was presented for the trial court to exercise a judicial discretion, as to whether there should be a specific performance of the contracts alleged in the complaint or not. Land Co. v. Roe, 8 App. Div. 367, 40 N. Y. Supp. 799. A similar doctrine was laid down in Dunckel v. Dunckel, 141 N. Y. 434, 36 N. E. 405, and in Frain v. Klein, 18 App. Div. 65, 45 N. Y. Supp. 394. In Stokes v. Stokes, 155 N. Y. 590, 50 N. E. 345, Martin, J., said:

"The right of specific performance rests in the judicial discretion of the court, and may be granted or withheld upon a consideration of all the circumstances, and in the exercise of such discretion." (Citing cases.) "It is a well-established principle relating to this subject that specific performance will never be decreed where it would be inequitable. It is immaterial whether the fact that it is inequitable arises from the provisions of the contract, or from external facts or circumstances which affect the situation and relations of the parties; for in either case it may constitute a sufficient ground for a court of equity to withhold this peculiar relief, and to leave the parties to their legal remedy." (Citing cases.)

In Trustees v. Thatcher, 87 N. Y. 317, Danforth, J., said:

"It certainly is not the doctrine of courts of equity to enforce by its peculiar mandate every contract, in all cases, even where specific execution is found to be its legal intention and effect. It gives or withholds such decree according to its discretion, in view of the circumstances of the case; and the plaintiff's prayer for relief is not answered where, under those circumstances, the relief he seeks would be inequitable. * * * If for any reason, therefore, not referable to the defendant, an enforcement of the covenant would defeat either of the ends contemplated by the parties, a court of equity might well refuse to interfere, or if in fact the condition of the property by which the premises are surrounded has been so altered 'that the terms and restrictions' of the covenant are no longer applicable to the existing state of things. * * * And so, though the contract was fair and just when made, the interference of the court should be denied if subsequent events have made performance by the defendant so onerous that its enforcement would impose great hardship upon him, and cause little or no benefit to the plaintiff."

In Story, Eq. Jur. § 751a, it is said:

"Courts of equity will also, in allowing or denying a specific performance, took, not only to the nature of the transaction, but also to the character of the parties who have entered into the contract."

And in section 769 that same author says:

"We have already seen that the specific execution of a contract in equity is a matter not of absolute right in the party, but of sound discretion in the court. Hence it requires a much less strength of case on the part of the defendant to resist a bill to perform a contract than it does on the part of the plaintiff to maintain a bill to enforce a specific performance."

And in section 742 he says:

"In truth, the exercise of this whole branch of equity jurisprudence, respecting the rescission and specific performance of contracts, is not a matter of right in either party, but it is a matter of discretion in the court,—not, indeed, of arbitrary or capricious discretion, dependent upon the mere pleasure of the judge, but of that sound and reasonable discretion which governs itself, as far as it may, by general rules and principles, but, at the same time, which withholds or grants relief according to the circumstances of each particular case, when these rules and principles will not furnish any exact measure of justice between the parties."

The evidence delivered at the special term satisfactorily establishes that the defendant had built, maintained, and operated the road in accordance with the provisions of the contract until December, 1894, and the three following months in 1895. Apparently the expenditure had been $150,000 to bring into existence the railroad, in compliance with the conditions of the agreements that the railroad should be constructed; and it seems that after it was constructed it was operated in strict accordance with the terms of the contract until the storms prevented in the four months mentioned, and subsequent to those months the railroad was operated in accordance with the terms of the agreement down to the time of the trial, which occurred on the 10th of May, 1897. The evidence given at the trial satisfactorily supports the twentieth finding, to wit, "that it was practically impossible for the said Bellevue Land & Improvement Company to operate the said electric street railway during the winter of 1894–95 pursuant to the terms of the agreements dated June 1, 1892, and March 1, 1893. * * *" The evidence also satisfactorily establishes that the plaintiff sustained no damage by reason of the non-operation during those months of the road. Indeed, the plaintiff did not become aware of the obstructions and inoperation until October, 1896, when it was seeking an opportunity to avoid its obligations.

It is contended in behalf of the respondent that the obligation on the part of the defendant, by force of the language of the agreement of March 1, 1893, is absolute and unqualified to run cars every half hour from 7 a. m. to 8 p. m., under all conditions and circumstances, until the plaintiff shall have sold the land which it purchased; and it therefore relies upon the doctrine laid down in Harmony v. Bingham, 12 N. Y. 99, and Beebe v. Johnson, 19 Wend. 500, and Tompkins v. Dudley, 25 N. Y. 272, and Ward v. Building Co., 125 N. Y. 230, 26 N. E. 256. Those cases related to contracts which in their terms were absolute and without any qualification, and were so treated in the adjudications made in respect to them. However, there

are numerous cases where courts have implied a condition in a contract where a performance of it had, without the fault of the party, become impossible. Such was the case of Dexter v. Norton, 47 N. Y. 62; Lorillard v. Clyde, 142 N. Y. 456, 37 N. E. 489; Stewart v. Stone, 127 N. Y. 507, 28 N. E. 595. In searching for the intention of the parties at the time they used the language in respect to the building, maintaining, and operating the railroad, and the times when cars should be run, force must be given to all the language used, including that which expressly declares, "as such street railroads are usually run until said land is sold"; and that language is to be construed in the light of all the circumstances surrounding the parties at the time of the execution of the contract, as well as the purposes to be accomplished by the construction, maintenance, and operation of a street railroad. Railroad Co. v. Bowns, 58 N. Y. 573; Russell v. Allerton, 108 N. Y. 288, 15 N. E. 391. When the parties used the language, they were contemplating a suburban railroad, and it is not unreasonable to suppose that they contemplated that such railroad should be operated as railroads of that character are usually operated in the neighborhood of the locality of the one provided for. Doubtless the words "every half hour from 7 a. m. to 8 p. m." related to the schedule that the road was to adopt in the operation of its cars, rather than for the purpose of making an imperative undertaking on the part of the defendant that its cars should thus be run in defiance of all obstacles or hindrances that might occur. It was understood by the parties that railroads adopt schedule time, and that there are, from sundry causes, embarrassments and difficulties which are encountered by street railroads in observing schedule time; and hence it is apparent, with that thought in mind, the parties used the words, "as such street railroads are usually run," to indicate the extent and nature of the obligation to be assumed by the contracting party. The construction suggested seems to be such as to give rise to the supposition that that would accomplish the purpose of the parties, and to harmonize with the practical situation. The construction suggested would serve "the convenience of passengers," which seemed to be one of the purposes of bringing the railroad into existence. In this case there was no willful or intentional departure from the usual course of operating suburban railroads by the defendant. The findings warrant the conclusion, as did the evidence, that the defendant made diligent efforts to operate the road without interruptions; and the findings also warrant the conclusion that the respondents' lands were not affected by the interruptions caused by the excessive storms of December, 1894, and the three following months of 1895. Indeed, there is an express finding that "no damage appeared by the evidence to have been caused to any person interested in said land by the failure of the Bellevue Land & Improvement Company, or the company owning or engaged in the operation of said street railroad, to run cars on said railroad when it was obstructed or blocked with snow or snowdrifts." In Town of Mt. Morris v. King, 77 Hun, 18, 28 N. Y. Supp. 281, it was held that a forfeiture is not favored by law, and the provisions of an agreement upon which it is based must be strictly construed." In the course of

the opinion delivered by Haight, J., it was said in respect to an agreement then under consideration that its stipulations were not intended to cover "trifling breaches of the contract that might be made in many ways, such as the failure to keep the road, or some particular part thereof, in as high a state of repair as the officers of the town might think it should be in," and that the special language used was to be read in connection with the whole contract. If we turn to the exact language of the contract, we find that it is a stipulation that in case said street railway shall not be constructed, maintained, and operated as hereinbefore provided, the said party of the first part will, at the request of the party of the second part, take back the said land. There has not been a failure to construct, to maintain, or to operate the road. As already suggested, the road was built at an expense of some $150,000. It was maintained by a large expenditure of money, and it was operated from the time it was opened down to the time of the trial, except the period when the storms interfered, for some four months. We think that that interruption was not such a breach of the contract as was contemplated by the parties at the time they entered into the agreement upon which reliance is placed for the right to have a court of equity enforce the alternative provisions of the contract. Kimball v. West, 15 Wall. 379.

The foregoing views lead to the conclusion that the decision of the trial court should be reversed.

Judgment reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur, except FOLLETT and GREEN, JJ., dissenting, in favor of an affirmance, on opinion of WOODWARD, J., delivered at special term.