[L. A. No. 5774.    In Bank.—July 11, 1922.]

## POULTRY PRODUCERS OF SOUTHERN CALIFORNIA, INC. (a Corporation), Respondent, v. L. F. BARLOW, Appellant.

[1] MONOPOLIES—PRODUCE SALE AGREEMENT—ORGANIZATION OF POULTRY RAISERS.—A contract between a corporation organized by poultry raisers for co-operative effort in marketing their products and a stockholder thereof obligating the latter to sell all eggs produced from his poultry through the corporation and requiring the corporation to resell the eggs at the best prices obtainable and pay over to the stockholder the proceeds after deducting therefrom the seller's cost of transportation and an amount for selling costs to be determined by the corporation, did not create an unlawful trust or combination in restraint of trade in contravention of the Cartwright Act (Stats. 1907, p. 984), in view of the proviso that was added in 1909 excepting from the operation of the act corporations organized for the purpose of marketing the products of its members (Stats. 1909, p. 593).

[2] CORPORATIONS—SUBSCRIPTION AGREEMENT—OPTION TO .PURCHASE STOCK.—A clause in a subscription agreement purporting to give to the corporation to be organized thereunder the right, at its option, to purchase its shares from any of its stockholders, at any` time, at a price equal to the current book value of the shares, is illegal and void, and, consequently, unenforceable.

[3] CONTRACTS—PRODUCE SALE AGREEMENT—INVALID PROVISION AS TO PURCHASE OF STOCK—EFFECT OF.—An agreement between a corporation organized by poultry raisers and a stockholder thereof is not invalid as to the provisions requiring the latter to market

---

2. Right of corporation to purchase its own shares of stock, notes, 17 Ann. Cas. 1261; Ann. Cas. 1914B, 1016; 61 L. R. A. 621; 25 L. R. A. (N. S.) 50; 30 L. R. A. (N. S.) 694; 44 L. R. A. (N. S.) 156.

all of his products through the corporation and obligating the corporation to sell the same at the best prices obtainable and account for the proceeds less costs of sale, by reason of the invalid provision giving the corporation the optional right to purchase its own stock from the stockholder, since the exercise of the option is no part of the consideration of the promise of the stockholder.

[4] INJUNCTION—PREVENTION OF BREACH OF CONTRACT.—In view of subdivision 5 of section 3423 of the Civil Code, an injunction cannot be granted to prevent the breach of a contract where its performance would not be specifically enforced.

[5] SPECIFIC PERFORMANCE—MUTUALITY OF REMEDY.—Mutuality of remedy is an indispensable prerequisite to the specific performance of a contract.

[6] ID.—CONTRACT FOR PERSONAL SERVICE.—With the exception of such special, unique, and extraordinary services as fall within the purview of the amendments of May 6, 1919, to section 3423 of the Civil Code and section 526 of the Code of Civil Procedure, the general rule is that a contract for service will not be specifically enforced, either directly by means of a decree directing the defendant to perform it, or indirectly by an injunction restraining him from violating it, and especially where the relation between the contracting parties is one of mutual confidence, and the contract stipulates for acts that require special knowledge, skill, or ability, or the exercise of judgment, discretion, integrity, and like personal qualities.

[7] ID.—CONTRACT PROVIDING FOR SUCCESSION OF ACTS.—Courts of equity will not decree the specific performance of contracts which by their terms stipulate for a succession of acts whose performance cannot be consummated by one transaction, but will be continuous and require protracted supervision and direction.

[8] ID.—MARKETING OF PRODUCTS—NONENFORCEABILITY OF SALE AGREEMENT.—An agreement between a corporation organized by poultry raisers and a stockholder thereof requiring the latter to sell all of his products for certain stated years to the corporation and obligating the corporation to resell the products at the best prices obtainable therefor under market conditions and pay over the proceeds to the stockholder less costs of sale is not enforceable either by injunction or by decree of specific performance, since such a contract is one of agency calling for services of the corporation of a highly personal nature, requiring the exercise of skill and discretion and covering repeated transactions to extend over a number of years.

[9] ID.—WANT OF MUTUALITY—REMOVAL BY PERFORMANCE.—A want of mutuality in the right to specific performance existing at the

inception of a contract may be removed when there has been a full and substantial performance of the contract.

[10] ID.—OFFER OR WILLINGNESS TO PERFORM—EFFECT OF.—Where a contract is not specifically enforceable because of want of mutuality of remedy, the offer or willingness of one of the parties to do what otherwise he could not be specifically required to do does not confer the right to compel performance from the other party.

APPEAL from a judgment of the Superior Court of Los Angeles County. Dana R. Weller, Judge. Reversed.

The facts are stated in the opinion of the court.

F. R. Baker and Marshall Stimson for Appellant.

Willis I. Morrison for Respondent.

Aaron Sapiro, Milton D. Sapiro, Lawrence L. Levy, and Oliver B. Wyman, *Amici Curiae.*

SLOANE, J.—The plaintiff is a corporation organized by poultrymen of Southern California for co-operative effort in marketing their products. The stockholders of the corporation are all producers holding one share of stock each for every thousand hens owned. Each stockholder is obligated, under what is termed a produce sale agreement, to sell all eggs produced from his poultry through the corporation.

In this action plaintiff recovered judgment in the superior court of the county of Los Angeles against the defendant, one of the contracting stockholders, for $230, stipulated damages for breach of contract by reason of sale of eggs to other purchasers, and for specific performance of the contract to sell and deliver eggs to plaintiff during the unexpired term covered by the contract, and enjoining defendant from making sales of his product to other persons. Defendant appealed.

A hearing was granted before this court on respondent's petition therefor after judgment of reversal by the district court of appeal.

The latter court affirmed the judgment of the trial court for recovery of damages, but granted a reversal as to injunction and specific performance.

In taking the matter over for rehearing we were in accord with the part of the decision affirming the judgment for damages, but were not satisfied at the time that plaintiff was not also entitled to the equitable relief by injunction and specific performance.

On further consideration of this part of the judgment we have reached a conclusion in accord with that of the district court of appeal.

Both of these remedies are subject to the same limitation. Neither can be enforced unless there is mutuality of remedy between the parties.   It is provided by section 3423 of the Civil Code that an injunction cannot be granted restraining the violation of contract, "the performance of which would not be specifically enforced," and the doctrine is elementary and impregnably fortified by authority that a contract cannot be specifically enforced unless this remedy is available to both parties.   Equity will not enforce a specific performance of a contract when the party asking its enforcement cannot, from the nature of the obligation assumed, be compelled to perform on his part.

While there is, perhaps, nothing in the obligation assumed by the defendant under the contract in question which binds him to sell and deliver to plaintiff all the eggs produced from his poultry during a given period of time that could not be specifically enforced, if it were a simple sale for cash to be paid on delivery, a different condition is presented when the reciprocal obligation of the plaintiff calls for a future performance, and consists of the exercise of personal skill, diligence, and discretion in finding the best market for the eggs, selling them for a suitable price, and paying to the defendant a certain percentage of the proceeds, and where the transaction is to be repeated at frequent intervals throughout a number of years.

So far as this marketing contract is concerned, it is, on the part of the plaintiff, a contract of agency calling for services of the corporation of a highly personal nature, requiring the exercise of skill and discretion, and covering repeated transactions to extend over a number of years.   It has not been the practice of courts of equity to attempt to enforce such complicated personal obligations, or to burden themselves with the supervision of frequently recurring duties of contracting parties.

We adopt the following exhaustive opinion, written by Mr. Justice Finlayson of the district court of appeal, as fully covering the facts and the law of this case:

"In addition to damages for breach of contract, plaintiff, by the auxiliary force of an injunction, seeks to prevent the further breach of that provision of defendant's contract whereby he expressly undertakes to sell to plaintiff such of the eggs produced by his poultry during the years 1917, 1918 and 1919 as he intends to sell in any event. The breach complained of is that, since about May 17, 1917, defendant has sold to others than plaintiff all the eggs produced by his flocks. The action was tried January 11, 1918, and judgment, which passed for plaintiff, was entered March 11, 1918. The lower court found that up to the date of the commencement of the action, plaintiff had been damaged in the sum of $230 by reason of defendant's failure to sell and deliver eggs to it exclusively. It was adjudged that plaintiff recover that sum as damages and likewise that defendant be enjoined from marketing, delivering or selling to anyone other than plaintiff, during the remainder of the calendar year 1918 and all of the calendar year 1919, any of the eggs produced by his flocks and which he intended in any event to sell or market. From this judgment defendant appeals. The appeal is on the judgment-roll alone.

"Plaintiff, a California corporation, was organized in December, 1916, for the purpose of promoting the raising of poultry and the production of eggs in Southern California, through and by means of co-operative methods that had been suggested by the state market director. To that end defendant, and a number of others engaged in raising poultry in Southern California, executed a document bearing the caption 'Subscription Agreement,' whereby they agreed that a corporation should be organized, to be known as the 'Poultry Producers of Southern California, Inc.,' for the purpose of promoting and fostering the business of raising poultry and marketing eggs in the state of California. Each of the incorporators, one of whom was this defendant, subscribed for and agreed to purchase one share for every one thousand hens owned by him. Defendant, whose flock did not exceed one thousand hens, subscribed for one share. Pursuant to the agreement thus executed by

defendant and the other poultrymen, plaintiff was brought into existence as a legal corporate entity. This 'Subscription Agreement' contains a provision whereby it is attempted to give to the corporation to be organized thereunder the right, at its option, to purchase its shares from any of its stockholders, at any time, at a price equal to the current book value of the shares.

"Contemporaneously with the execution of the so-called 'Subscription Agreement,' and as a part of the entire contract, defendant and the other poultry raisers each executed a second document entitled 'Produce Sale Agreement,' whereby defendant and his co-operating fellow poultry raisers undertook to sell and deliver their eggs to plaintiff, upon the latter's organization as a going concern. So far as its terms are material here, the 'Produce Sale Agreement' so executed by defendant is as follows:

" 'This agreement, made as of the first day of February, 1917, between the Poultry Producers of Southern California, Inc., a California corporation, to be incorporated, with its office at Los Angeles, California, hereinafter called the buyer, first party, and the undersigned [the defendant], hereinafter called the seller, second party: Witnesseth that: In consideration of the mutual obligations herein and of the agreements by each of the parties hereto and of the agreement of all the original subscribers to stock in said "Buyer" corporation, the buyer agrees to purchase and market and the seller agrees to sell and to deliver to the buyer—for the price to be secured by the buyer as hereinafter mentioned—such of the eggs produced by the seller, his lessors, assignors or successors, during the years 1917, 1918 and 1919, as he intends to sell or market in any event. The buyer agrees to use its best efforts to resell said eggs at the best prices obtainable under market conditions, and, after deducting therefrom the seller's cost of transportation and an amount for selling costs (to be determined by the buyer, in its sole and exclusive discretion), not to exceed two cents per dozen eggs, to pay over the amounts received thereby as payment in full to the seller. . . . The eggs delivered by the seller hereunder may be mingled and sold with other eggs of like grade and like quality purchased by the buyer under contracts similar to this contract, and the amount to be paid to the seller weekly,

as herein stated, shall be based on the proportional value in eggs delivered by him to the buyer out of the total weekly receipts of moneys from the sale or other disposition of the eggs according to quality and grade, less the deductions hereinabove mentioned. At the discretion of the board of directors the buyer may itself purchase from seller eggs of a quality satisfactory to itself at a price equal to the net price to seller under this contract, which eggs it may warehouse and sell at such future time as the board of directors may direct, without making further accounting to seller therefor. . . . This agreement shall be binding upon the seller for the full term hereof, and he shall be obligated hereby for all eggs produced for him whether he produces the same directly or lets or leases or in any way exercises ownership· or control or has the legal right to so exercise ownership or control of said egg production during the term of this contract.'

"Appellant contends: (1) That the contract evidenced by the two documents signed by him—the 'Subscription Agreement' and the 'Produce Sale Agreement'—is void and unenforceable, because: (a) It violates the act commonly known as the Cartwright law (Stats. 1907, p. 984, and Stats. 1909, p. 593); (b) It gives to the corporation to be created under the 'Subscription Agreement' the optional right to purchase its own stock from its stockholders, and (2) For lack of mutuality of remedy, and other reasons which we deem unnecessary to mention in view of our conclusion, defendant's agreement to sell his eggs to plaintiff is not one that will be specifically enforced.

[1] "1. We see no reason for holding that the contract creates an unlawful trust or combination in restraint of trade in contravention of the Cartwright Act. Appellant contends that the contract violates subdivisions 3 and 5 of section 1 of that act. It may be assumed, for the purpose of this decision only, that the contract would be contrary to subdivisions 3 and 5 of section 1, but for the *proviso* that was added in 1909 reading: 'Provided that no agreement, combination or association shall be deemed to be unlawful or within the provisions of this act, the object and business of which are to conduct its operations at a reasonable profit or to market at a reasonable profit those products which cannot otherwise be so marketed; provided, further,

that it shall not be deemed to be unlawful, or within the provisions of this act, for persons . . . engaged in the business of selling . . . commodities of a similar or like character, to employ, form or organize . . . any . . . corporation, having for its object or purpose the . . . marketing . . . of such commodities.' We think it fairly inferable from the findings that the object of the agreement executed by defendant and the other poultry raisers, as a result of which plaintiff was incorporated and organized, and the object and business of the combination or association thus formed were to market the poultry raisers' eggs at a reasonable profit; also that only by the formation of some such co-operative association, and the organization of a common sales agency, such as plaintiff, can their eggs be marketed at a reasonable profit.   Moreover, it further appears from the trial court's findings that defendant and the other poultry raisers who signed similar agreements are persons engaged in the business of selling commodities of like character, to wit, eggs; that they organized plaintiff as a corporation entity and employed it as their common sales agency; and that plaintiff's object and purpose is the marketing of such eggs.   Thus is the clause of the *proviso* of 1909, whereby certain agreements, combinations and associations are recognized as lawful and are expressly declared not to be within the inhibitory provisions of the Cartwright Act.

[2]   ''2. It may be conceded that, as appellant contends, the clause in the 'Subscription Agreement' purporting to give to the corporation to be formed thereunder the optional right to purchase its own stock from any of its shareholders is illegal and void, and, consequently, unenforceable.   (See *Schulte* v. *Boulevard Gardens etc. Co.,* 164 Cal. 464 [Ann. Cas. 1914B, 1013, 44 L. R. A. (N. S.) 156, 129 Pac. 582].) The defendant, as well as each of the other poultrymen who joined with him in the execution of the 'Subscription Agreement' and the 'Produce Sale Agreement' promised to do several things, one of which was to give to the corporation about to be incorporated and organized the optional right to purchase its own stock at any time that it elected so to do.   The corporation was not obligated to buy its own shares.   It could do so or not at its option.   It is here seeking to recover damages for the breach of and to specifically enforce one only of several promises made by defendant—

a promise that, considered by itself, is legal and valid. The exercise by the corporation of its optional right to purchase any of defendant's stock is no part of the consideration for any of the promises made by defendant. The option was intended for the benefit of the corporation, not defendant. Each of the valid promises made by defendant is supported by a legal consideration. Defendant's illegal and unenforceable promise to give to the corporation, when formed, the optional right to purchase any of his stock at any time after its issuance to him is not so mingled and bound with his other and valid promises that they cannot be separated. All of the consideration moving from the corporation to defendant for his legal promises is legal and valid. ' . . . if one gives a good and valid consideration, and thereupon another promises to do two things—one legal, and the other illegal—he shall be held to do that which is legal, unless the two are so mingled and bound together that they cannot be separated, in which case the whole promise is void.' (*Hanauer & Co.* v. *Gray*, 25 Ark. 350 [99 Am. Dec. 226], citing Parsons on Contracts, 380.) 'Where an agreement founded on a legal consideration contains several promises, or a promise to do several things, and a part only of the things to be done are illegal, the promises which can be separated, or the promise, so far as it can be separated, from the illegality, may be valid. The rule is that a lawful promise made for a lawful consideration is not invalid merely because an unlawful promise was made at the same time and for the same consideration, and this rule applies, although the invalidity is due to violation of a statutory provision, unless the statute expressly or by necessary implication declares the entire contract void.' (13 C. J., sec. 470, p. 512.)

[3] "For these reasons we are satisfied that the contract between plaintiff and defendant, the resultant of the 'Subscription Agreement' and the 'Produce Sale Agreement' executed by defendant and the other poultry raisers, and which plaintiff, upon its creation and organization, accepted as its own, was and is a valid contract in so far, at least, as plaintiff is here seeking its enforcement, and that plaintiff, therefore, is entitled to its damages for defendant's breach thereof. We think, however, that, for the reasons we are about to state, plaintiff is not entitled to a specific

performance of defendant's unperformed obligation to sell and deliver eggs.

"3. Our code expressly provides that an injunction cannot be granted to prevent the breach of a contract where its performance 'would not be specifically enforced.' (Civ. Code, sec. 3423, subd. 5.) But for this express statutory limitation upon the court's power to grant injunctive relief, it is possible that the part of the decree which enjoins defendant from selling eggs to others than plaintiff might be upheld, notwithstanding the lack of mutuality of remedy. For it appears to be the rule in some jurisdictions that where a contract confers on one party an exclusive right or privilege, a breach of the contract through conduct of the other party inconsistent with the exclusiveness of the right or privilege may be enjoined, subject to the general principle as to the inadequacy of the legal remedy for the breach, and it is immaterial that such inconsistent conduct is not prohibited by the express terms of the contract; also that, notwithstanding a lack of mutuality of remedy, it is possible to secure performance of the plaintiff's stipulations, indirectly, by making the injunction conditional on continued performance by him, and dissolving the injunction when a breach on his part appears. (Pom. Eq., vol. 5, sec. 296, and vol. 6, sec. 775; *Standard Fashion Co.* v. *Siegel-Cooper Co.,* 157 N. Y. 60 [68 Am. St. Rep. 749, 43 L. R. A. 854, 51 N. E. 408].) [4] In this jurisdiction, however, the express statutory inhibition above referred to—subdivision 5 of section 3423 of the Civil Code—prohibits the granting of an injunction to prevent the breach of any contract, 'the performance of which would not be specifically enforced.' The result is that in this state the courts may not enter a conditional decree in order to avoid the effect of a lack of that mutuality of remedy which is an essential to the right to specific performance. (*Anderson* v. *Neal Institutes Co.,* 37 Cal. App. 174 [173 Pac. 779].)

[5] "It is elementary that mutuality of remedy is an indispensable prerequisite to the specific performance of a contract. The remedy must be mutual, as well as the obligation, and when the contract is of such a nature that it cannot be specifically enforced as to one of the parties, equity will not enforce it against the other. (*Cooper* v. *Pena,* 21 Cal. 404; *Stanton* v. *Singleton,* 126 Cal. 657 [47

L. R. A. 334, 59 Pac. 146]; *Los Angeles etc. Development Co.* v. *Occidental Oil Co.,* 144 Cal. 528 [78 Pac. 25]; *Pacific etc. Ry. Co.* v. *Campbell-Johnston,* 153 Cal. 106 [94 Pac. 623].) 'Neither party to an obligation can be compelled specifically to perform it, unless the other party thereto has performed, or is compellable specifically to perform, everything to which the former is entitled under the same obligation, either completely or nearly so, together with full compensation for any want of entire performance.' (Civ. Code, ·sec. 3386.)

[6] "With the exception of such special, unique and extraordinary personal services as fall within the purview of the amendments of May 6, 1919 [Stats. 1919, pp. 325, 328], to section 3423 of the Civil Code and section 526 of the Code of Civil Procedure, the general rule is that a contract for *service* will not be specifically enforced, either directly by means of a decree directing the defendant to perform it, or indirectly by an injunction restraining him from violating it. Especially is this the rule where the relation between the parties to the contract is one of mutual confidence, and the contract stipulates for acts that require special knowledge, skill or ability, or the exercise of judgment, discretion, integrity and like personal qualities. This rule is codified in subdivisions 1 and 2 of section 3390 of our Civil Code.

"The rule that equity will not specifically enforce an obligation to render personal service has been assigned three distinct reasons for its existence. Some courts have based the rule upon the fact that it would be an invasion of one's statutory liberty to compel him to work for, or to remain in the personal service of, another. It would place him in a condition of involuntary servitude—a condition which the supreme law of the land declares shall not exist within the United States, or in any place subject to their jurisdiction. Another reason assigned for the rule, according to some of the authorities, is that, in view of the peculiar personal relation that results from a contract of service, it would be inexpedient, from the standpoint of public policy, to attempt to enforce such a contract specifically. It is said by the judges who based the rule upon this consideration of public policy that, where one of the contracting parties is to act as the confidential agent of the other, it is necessary, not only for the parties, but for the sake of society at large, that

there should be entire harmony and a spirit of co-operation between the contracting parties. The third reason for the rule, as given by other authorities, is that it is inconvenient, or, as others express it, impossible, for a court of justice to conduct and supervise the operations incident to and requisite for the execution of a decree for the specific performance of a contract which involves the rendering of personal services. For a discussion of these three bases of the rule, see the note to *H. W. Gossard Co.* v. *Crosby,* 6 L. R. A. (N. S.), p. 1125 et seq. . . .

[7] ''Growing out of the last of the three enumerated reasons for the rule that equity will not specifically enforce a contract for services that are of a strictly personal nature, is the cognate rule that courts of equity will not decree the specific performance of contracts which by their terms stipulate for a succession of acts whose performance cannot be consummated by one transaction, but will be continuous and require protracted supervision and direction. (*Stanton* v. *Singleton,* 126 Cal. 665 [47 L. R. A. 334, 59 Pac. 146]; *Pacific etc. Ry. Co.* v. *Campbell-Johnston, supra; Crane* v. *Roach,* 29 Cal. App. 587 [156 Pac. 375]; *Anderson* v. *Neal Institutes Co., supra.*) 'Courts of equity,' says the court in *Pacific etc. Ry. Co.* v. *Campbell-Johnston,* 153 Cal. 117 [94 Pac. 628], 'only decree specific performance where the subject matter of the decree is capable of being embraced in one order and is immediately enforceable. It will not decree specific performance when the duty to be performed is a continuous one, extending possibly over a long period of time, and which, in order that the performance may be made effectual, will necessarily require constant personal supervision and oversight of it by the court.'

[8] ''Turning now to the contract in question here, and considering it in the light of the foregoing principles: By the terms of their contract, defendant agrees to 'sell and deliver' to plaintiff, and the latter 'agrees to purchase and market,' such of the eggs produced by defendant's poultry during the years 1917, 1918 and 1919 as he intends to sell or market in any event; and, further, plaintiff expressly agrees 'to use its best efforts to resell said eggs at the best prices obtainable under market conditions.' It is of prime importance to defendant, as one of the poultrymen for whom plaintiff is acting as sales agent—for that is practically what

189 Cal.—19

the relationship amounts to—that plaintiff should market the eggs at the times when and in the markets where the best possible prices can be obtained—in other words, that it should indeed exercise 'its best endeavors' in an honest effort to resell the eggs at the best market prices; for defendant and the other poultry owners for whom plaintiff has agreed to act are to receive for the eggs that they sell and deliver to plaintiff such sums as plaintiff, in its turn, may succeed in reselling the eggs for, less the expenses incurred by it for transportation and other necessary marketing and selling costs, not exceeding a maximum of two cents per dozen.

"The exercise by plaintiff of 'its best efforts to resell the eggs at the best prices obtainable under market conditions' involves some degree of personal services, knowledge, judgment and skill, and a repose of confidence. Defendant's agreement to sell and deliver, and plaintiff's undertaking to use its best efforts to resell the eggs at the best prices obtainable under market conditions, is more than a mere contract of purchase and sale. Plaintiff has been made the common agent of all the subscribing poultry owners to perform the very services that they themselves would have had to do individually had they not created plaintiff as their common agent for the furtherance of their co-operative enterprise. That is, they themselves, individually, would have had to go into the most favorable markets, reasonably accessible to them as individuals, and there have sought the best obtainable prices. This personal service, involving the exercise of judgment and discretion, plaintiff has undertaken to perform for defendant and the other poultry raisers engaged with him in the co-operative marketing of eggs.

"Moreover, a decree of specific performance enforcing plaintiff's obligation to resell the eggs at the best prices obtainable during the years 1918 and 1919 would involve a continuous and long series of acts of supervision, requiring special knowledge, skill and judgment, and repeated examinations and new directions by the court, and, as we have seen, a court of equity will not undertake to frame a decree for the specific performance of a contract the performance of which cannot be consummated by one transaction, but will be continuous and require protracted super-

vision and direction, with the exercise of special knowledge, skill or judgment in such oversight.

"It is suggested that the rule that specific performance will not be decreed where such performance would require the constant supervision of the court is not an absolute rule, but one of discretion only, and, therefore, is not a limitation of the jurisdiction of the court, otherwise courts of chancery could not recognize an exception to the rule when considerations of public policy intervene, as, for example, where contracts have been made by railway companies obligating them to build sidetracks, extensions, etc. This statement of the law appears to find support in some of the cases. (See *Standard Fashion Co.* v. *Siegel-Cooper Co., supra;* 36 Cyc. 587; *Brown* v. *Western Maryland R. Co.,* 84 W. Va. 271 [4 A. L. R. 523, 99 S. E. 457].) Assuming, for the purposes of this decision only, that the rule is not one that goes to the very jurisdiction of the court, as a court of equity, but that it is a rule of decision only, based upon considerations of convenience and judicial discretion, the rule, nevertheless, is one of those fixed principles of equity that have become established for the guidance of the court, and any departure therefrom, save where the convenience of the public would have promoted, would amount to an abuse of the court's legal discretion. (*Rochester & K. F. Land Co.* v. *Roe,* 8 App. Div. 360 [40 N. Y. Supp. 799, 805].) We think it clear that, in the exercise of a judicial discretion, a court of equity should always decline to enforce specific performance where, as here, private interests only are involved, and the task of supervision, in order to see to it that plaintiff, in good faith, exercises its best judgment and skill in marketing the eggs for the highest possible prices, would impose upon the court a duty well nigh impossible of performance.

"It is claimed by respondent that the general rule requiring mutuality of remedy is subject to the exception that when a party has substantially performed his part of the contract he may compel specific performance by the other party. In this regard our attention is called to the fact that the lower court found that plaintiff, shortly after its organization, in reliance upon defendant's contract and similar contracts executed by the other poultrymen, rented a large warehouse for a central distributing depot; that it

entered into contracts obligating it to sell and deliver eggs to third persons during the year 1917, and that it expended considerable sums of money for the purposes of standardizing the egg product to be delivered by it.

[9] "Undoubtedly a want of mutuality in the right to specific performance, existing at the inception of a contract, may be removed, and is removed when there had been a full and substantial performance of the contract. And if the renting of the warehouse, the making of contracts for the resale of eggs during the year 1917, and the expenditure of moneys to standardize the egg products, could be said to constitute a substantial performance of plaintiff's agreement to use its best efforts to resell the eggs during the years 1917, 1918 and 1919 at the best obtainable prices, then plaintiff would be entitled to specific performance. The substantial execution by plaintiff of its obligation would give present mutuality to the contract, although in its inception it lacked it. (*Spires* v. *Urbahn,* 124 Cal. 110 [56 Pac. 794].) But nothing less than a full or substantial performance of plaintiff's obligations can create the mutuality of remedy necessary to entitle it to specific performance against defendant. The rule is stated in section 3386 of the Civil Code, as follows: 'Neither party to an obligation can be compelled specifically to perform it, unless the other party thereto has performed, or is compellable specifically to perform, everything to which the former it entitled under the same obligation, either completely or nearly so, together with full compensation for any want of entire performance.' (See, also, *Pacific etc. Ry. Co.* v. *Campbell-Johnston,* 153 Cal. 115 et seq. [94 Pac. 623].) It is quite evident that plaintiff's obligation has neither been performed nor substantially performed, and that it is not compellable to perform everything to which defendant is entitled under his contract, either completely or nearly so. It is alleged in the complaint and found by the court that plaintiff 'has entered into contracts for the sale of eggs during the *present* calendar year,' i. e., the year 1917. There remained, therefore, two years during which plaintiff, according to the terms of its obligation, was obligated to use 'its best efforts to resell the eggs at the best prices obtainable under market conditions.' It does not appear that it had made any contract to resell the eggs during those years. The con-

tract that it made for the resale of the 1917 egg product was made by it with a brokerage company. By this contract plaintiff employed the brokerage firm to sell eggs upon the market, during the year 1917, for the best prices obtainable, agreeing to pay a commission for such services. This contract, while it remained executory, was not even a partial performance of plaintiff's obligation. The brokerage company merely agreed to do for plaintiff what the latter had agreed with defendant and his fellow poultry raisers to do for them. Assuming, though by no means conceding, that plaintiff thus could delegate to the brokerage company authority to perform its obligation to exercise, from time to time and as necessary, its own judgment, or that of its directors or managing officials, in an honest endeavor to use its best efforts to resell the eggs at the highest market prices, still a large and very material part of plaintiff's obligation remained unperformed and unenforceable. When the complaint was filed on December 14, 1917, there still remained two years during which plaintiff was to resell defendant's eggs, and, to that end, use its best efforts to resell at the best prices obtainable in the markets of the state. The most that can be said is that plaintiff's obligation has been performed to a large extent, but it certainly cannot be said that it has performed or is compellable specifically to perform everything to which the defendant is entitled, either completely or nearly so.

[10] "Finally, it is suggested that plaintiff has performed its obligation as far as it can in view of defendant's refusal to deliver to it the eggs that he contracted to sell and deliver to plaintiff for resale by the latter. But neither the refusal of defendant to permit plaintiff to resell his eggs, nor plaintiff's willingness to do so, have any bearing on the applicability of the equitable principle that where there is no mutuality of remedy there can be no decree for specific performance. Every action for specific performance is based upon the refusal of a defendant to perform the terms of a contract which the plaintiff thinks equity should compel him to perform. So that a defendant's refusal to perform his part of the contract is of no moment so far as plaintiff's right to a decree of specific performance is concerned. (*Pacific etc. Ry. Co.* v. *Campbell-Johnston Co., supra; Roy* v. *Pos,* 183 Cal. 359 [191 Pac. 542]; *Moore* v. *Twohy,* 142

Cal. 342 [75 Pac. 896]; *King* v. *Gildersleeve,* 79 Cal. 504 [21 Pac. 961].) Neither does the offer or willingness of the plaintiff to do what otherwise he could not be specifically required to do confer the right to compel it from the other party. If this were true, then in the present instance plaintiff, by offering and expressing a willingness to resell eggs delivered to it by defendant, and to use its best efforts to secure the best market prices therefor, could have demanded of defendant a sale and delivery to it of all eggs produced by defendant's hens during the unexpired term of the contract, and, on defendant's refusal, and without its having performed any part of its contract for such balance of the term of the contract, but simply reiterating in its complaint its willingness to do so, could have demanded specific performance of defendant. The equitable doctrine, codified in section 3386 of the Civil Code, that the plaintiff is not entitled to a decree of specific performance unless he has performed or is compellable specifically to perform all or substantially all of his obligation, is not satisfied by a mere willingness, or offer, to perform. (See *Pacific etc. Ry. Co.* v. *Campbell-Johnston,* 153 Cal. 116 [94 Pac. 623].)

"It may be possible that if, before defendant breached his agreement, plaintiff had so altered its position that to deny it specific performance now would operate as a fraud upon it, equity would regard plaintiff's past performance as a substantial performance, and indirectly decree specific performance by defendant by enjoining him from selling his eggs to anyone other than defendant. But the complaint does not allege, nor does the court find, any fact from which such fraud may be inferred. It is true it is alleged in the complaint and found by the court that, relying upon the contracts made by it with the defendant and the other poultry raisers, plaintiff entered into contracts with various persons for the future conduct of its business, including a contract whereby it rented a warehouse for a central distributing depot, etc., but the nature and extent of the obligations and liabilities thus incurred by plaintiff under these contracts with third persons are not disclosed; nor do the pleadings or findings vouchsafe any information as to the period during which such contracts are or were enforceable. *Non constat* but that the contracts thus entered into by plaintiff with such third persons covered a period that has

wholly expired before the action was commenced, or even before defendant breached its contract. There is nothing to show that the obligations incurred by plaintiff under these contracts with third persons will become more onerous if defendant should fail specifically to perform his agreement to sell and deliver to plaintiff eggs during the years 1918 and 1919.

"Our conclusion is that the contract is valid and that plaintiff is entitled to the damages which the trial court found were suffered by it by reason of defendant's breach, but that it is not entitled to specific performance, either directly or indirectly, by enjoining defendant from violating his agreement; and that, in so far as the judgment decrees specific performance, either directly or indirectly, it should be so modified as to· omit those provisions. We also think that appellant is entitled to have the judgment thus modified, notwithstanding that the time during which he has been enjoined from selling eggs to others—the years 1918 and 1919—has expired. This is so because otherwise appellant would be deprived of his right to costs.

"The trial court found on all the issues presented by the pleadings. The rights of the respective parties are determinable from the findings, and a retrial is, therefore, unnecessary."

Were it not for the doctrine of mutuality of remedy as a prerequisite to the equitable relief here demanded, there would seem to be no good reason for denying respondent the more adequate relief that would be thus afforded to marketing corporations such as this which are more or less dependent for their efficient maintenance and operation upon ability to specifically enforce the mutual obligations of their members. The individual stockholder thus contracting the delivery of his wares would seem to be adequately safeguarded by his legal remedy for damages.

But in view of the established rule requiring mutuality of relief in equity, parties situated as is the respondent here will have to safeguard themselves as best they can by resort to their legal remedy in damages.

The judgment is reversed, with directions to the trial court to enter judgment on the findings conformable with the views herein expressed.

Wilbur, J., Waste, J., Shaw, C. J., and Lawlor, J., concurred.