## WARD v. PEARSALL.

(Circuit Court of Appeals, Ninth Circuit. January 5, 1925.)

No. 4243.

**1. Logs and logging ⊂⇒2—Contract for sale of timber land held valid and enforceable.**

A contract for the sale of timber land *held* not invalid for misrepresentations made by the seller and relied on by the purchaser nor for laches of the seller in not sooner tendering performance.

**2. Specific performance ⊂⇒6, 92(2)—Rule of mutuality of remedy not applied, where it is understood that title is in another than vendor; tender before or at trial held sufficient.**

The rule that mutuality of remedy, whereby from the time the contract is signed either party may enforce specific performance against the other, is essential is not applied, where it was well understood, when the contract was made, that the title was in another than the vendor, and in such case a tender of actual conveyance of title before or at the trial and before decree is sufficient to give present mutuality and sustain a decree for specific performance.

**3. Vendor and purchaser ⊂⇒129(1)—Contract held subject to state legislation reserving right of public fishing.**

Where it was understood by the parties at the time of a contract for sale of land that title was to be acquired from the state, the contract was subject to state legislation reserving the right to the public to fish on all land sold by the state.

**4. Vendor and purchaser ⊂⇒172—Vendor held entitled to interest only from tender of abstract showing good title.**

On a decree for specific performance in his favor, a vendor *held* not entitled to interest except from the time of his tender of an abstract showing good title.

Appeal from the District Court of the United States for the Southern Division of the Northern District of California; George M. Bourquin, Judge.

Suit by Clarence E. Pearsall against Willis C. Ward. Decree for complainant, and defendant appeals. Modified and affirmed.

Corbet & Selby and John R. Selby, all of San Francisco, Cal., and Elliott G. Stevenson and Leo M. Butzel, both of Detroit, Mich., for appellant.

J. N. Gillett, of San Francisco, Cal., and W. R. Bacon, of Los Angeles, Cal., for appellee.

Before GILBERT, HUNT, and RUDKIN, Circuit Judges.

HUNT, Circuit Judge. This is an appeal by Ward, defendant below, from a de-

cree for specific performance of a contract to purchase· timber lands in California.

The lower court decided that all the equities were with the plaintiff, Pearsall, and decreed that Pearsall, within a limited time, should deposit an abstract of title and a good and sufficient deed, and that, if such deposits were in compliance with the contract, Ward, within 10 days from notice of the deposit, should deposit the purchase price, together with interest and costs. ·Because of failure on the part of Ward to comply with the provisions of the decree, plaintiff was awarded judgment against Ward. Defendant appealed.

The contentions of the defendant are that the contract was procured by misrepresentation; that the consideration for the contract was inadequate; that Pearsall was guilty of· laches in not tendering performance; that he abandoned his contract; that there was no mutuality; and that there were errors in rulings upon the evidence.

We gather these facts: In 1902 Pearsall, a resident of California, tried to inter·est Ward, who was in Michigan, in acquiring a tract of some 7,680 acres of sugar pine timber in California. Ward wrote that he "would have to leave further timber land purchases in abeyance." But in January or February, 1903, Ward and Pearsall met in California, and together examined a map of the sections in which the timber was located, and, after conference, Pearsall and Ward, together with a timber cruiser whom Ward selected, examined the tract. The cruiser pointed out where the timber could be moved out. In response to Ward's request that the proposition be put in writing Pearsall wrote to Ward on July 2, 1903, stating that he held an undivided one-third interest in about 6,000 acres of sugar pine land in Mendocino county, and that he had options on from 2,000 to 3,000 acres adjoining the 6,000-acre tract; that he had an arrangement by which he could acquire the remaining undivided two-thirds of the 6,000-acre tract at the rate of $8.33⅓ per acre, and he offered to turn over to Ward the undivided two-thirds of the 6,000-acre tract at the above-stated price with good and unincumbered ·title, and also to turn over with like title at like price the undivided two-thirds of the additional tract of 2,000 to 3,000 acres, and take for himself the other undivided one-third thereof. The letter continued: "If I should· then desire you to do so, you are to provide the whole purchase price of such tract of 2,000 to 3,000

acres at $12.50 per acre and take the whole ·title in your name, and I will then pay back to you one-third of said $12.50 per acre, * * * you to deed me the undivided one-third thereof upon such payment, and one-third of taxes paid by you on said land to that time. I will turn over the said tract of 8,000 to 9,000 acres as above stated as soon as title to same is· perfected, and it is my expectation that I will be able to do so within a year from now. I will also furnish proper abstract of title which is. to be passed upon by such attorney as we may agree upon." Ward replied, accepting Pearsall's proposition. On July 13, 1905, Ward wrote to Pearsall, offering to modify the contract by agreeing to take at $4.44⅑ per acre Pearsall's one-third interest in the whole 9,000 acres, "being all the lands cov· ered by your proposition of July 2, 1903, accepted by me. * * * In other words, upon the conveyance to me in manner and form as provided in your said accepted proposition of July 2, 1903, of the whole San Hedron tract as aforesaid, I will pay to you two-thirds of the purchase price thereof at the rate of $12.77⅑ per acre, and execute and deliver to you my note for the remaining one-third of said purchase price. * * * If you see fit to accept the modification of. our agreement, as herein proposed, I will, of course, take in part performance of the modified agreement the · 2,200 acres or thereabouts, which, as I understand, you are presently able to convey under the original agreement, and upon the conveyance thereof to me with title as provided in the original agreement. I will pay you at the rate of $12.77⅑ per acre, two-thirds in .cash and the remaining· one-third in my note." On August 24, 1905, Pearsall wrote Ward: "I accept your offer of $12.-77⅑ per· acre for the whole tract, and will deed to you the same on the terms you state. * * *"

It was evidently understood between the parties that, as the title to the lands, except the 2,200 acres, was in the United States, it would be necessary to have the United States list the lands to the state of California, and that the state would then issue its patents to holders of state certificates which covered the lands. Delays occurred in the issuance of certificates and patents, but both Pearsall and Ward were using their efforts to have the lands patented, but not until 1918 were the lands finally listed. Pearsall then wrote to Ward that he · was ready to deliver the deed to the

lands and that he had deposited the deed with a bank to be delivered upon payment to the bank for his account the amount of the purchase price, plus $4,200 for taxes. Ward answered Pearsall, declining to proceed, and stating, among other things, that he was under no obligation to accept the conveyance because there was no enforceable contract, as Pearsall had misrepresented matters to him; the representation being that "the timber lands referred to could easily be made accessible for operation and removal of the timber by building a railroad into the timber connecting with the railroad then being constructed from San Francisco to Eureka." Ward wrote that he was willing to reconvey 2,200 acres that he had already purchased and paid for, and wished an adjustment of the whole controversy within 60 days from the date of the letter. As Ward failed to take up the deed, Pearsall brought this suit in February, 1919. After suit was commenced, there was further correspondence between the parties, and on March 20, 1919, Ward wrote to Pearsall, authorizing him to sell the lands by January 1, 1920, stating that Pearsall could retain all he received over $12.50 per acre. In pursuance to this letter Pearsall did try to sell the lands but failed, and in February, 1921, Pearsall commenced publication of summons.

In the interim between the making of the contract of 1903 and 1911 Mr. Chamberlain, an attorney who represented Mr. Ward, and Pearsall corresponded, and Ward and Pearsall exchanged visits on several occasions, but nothing was said by Ward or his attorney to indicate any unwillingness on the part of Ward to go on with the contract. In September, 1906, Pearsall telegraphed to Ward that he had an offer of $18 per acre for the tract, but Ward replied: "No I do not want to sell San Hedron lands, having contracted for them for permanent investment."

Defendant testified that he relied upon Pearsall's representations as to accessibility and quality of the timber; that he was on the tract with his cruiser before he accepted Pearsall's proposition of July 2, 1903; that his examination was "superficial"; that he was told the timber would go down the Eel river valley; that in 1904 he and his brother-in-law spent two days on the land; that between 1908 and 1918 he did not receive any letter from Pearsall; that in August, 1919, he urged Pearsall to dispose of the timber land, and wrote to

him extending the time for sale to January 1, 1921, provided his proposal was promptly accepted. The proposal evidently was the authority Ward had previously given to sell with right to retain all Pearsall could receive over $12.50 per acre.

[1] We take the view that the letters describing the lands and their probable value for timber, written to Ward by Pearsall before any agreement was entered into between them, became irrelevant, because Ward in his pleading admits that in August, 1902, he wrote that he could not then take up the matter referred to in the letters, and because the evidence is that he did not take it up at all until after he himself had examined the land and had received the written proposition of Pearsall, and because he admits the making of the contract of 1903 to purchase a two-thirds interest in the lands, and the amendment of the contract in 1905, whereby he agreed to take the whole tract at $12.77½ per acre. Defendant argues that Pearsall told him of a railroad in process of construction between San Francisco Bay and Eureka, and that he was induced by misrepresentations made by Pearsall that the timber was accessible for commercial purposes. But Mr. Ward had had long experience in the lumber business in Michigan before embarking upon this enterprise, and not only informed himself concerning the lands by a study of the map showing the location of the timber, but to obtain reliable, expert information employed his own cruiser, whom he had known in Michigan, to examine the property and to make a report upon the same. More than all this, upon receiving the report of his cruiser, Mr. Ward himself went to the lands, and, although he says his examination was "superficial," he must have gained a knowledge of conditions which satisfied him that the proposed contract was worth his while. It is clearly in evidence, too, that Ward's cruiser looked up a way by which the timber could be moved from the tract to a railroad, and that the cruiser and another man went to a point where they could see Elk creek and the country in general. The circumstances, therefore, are against Mr. Ward's contention that the examination was superficial, or that he was induced to make the contract by representations of Ward upon which he relied.

It is argued that Pearsall represented that there was a coal mine some 6 miles from the timber in the direction of where the logging road would go, and that in this

there was misrepresentation, as the mine was 18 miles from the lands. As there was no allegation in the pleadings to the effect that there was any reliance placed upon the location of any coal mine, or that it was an inducement to Ward to enter into the contract, the matter can be disregarded.

With respect to the substantive matter of accessibility of the land and the feasibility of building a railroad for logging an engineer and several witnesses of long logging experience testified that as a whole the land was a very good proposition, and that, except for a short distance, it was good for a logging railroad. Opposing opinions were expressed, but, inasmuch as the whole situation was considered by Mr. Ward before he made the contract, such opinions are immaterial.

So, likewise, is the contention that the contract price was more than double the actual value at the time of the sale immaterial. Ward, knowing as he did the situation of the property and what factors might properly be considered in estimating its value, cannot now say that, because the state of California only received $1.25 per acre for several hundred acres, Pearsall paid too high a price for the land. A circumstance in this connection is that Ward regarded the lands of great value, for in 1906 he rejected the telegraphic offer of $18 per acre, saying he had contracted for the lands as a permanent investment.

Was Pearsall guilty of laches in not tendering performance sooner than he did? We think not, because the evidence is that there was no misunderstanding between the parties that the time fixed for performance was when good title could be delivered. The parties themselves evidently acted upon such an understanding, for Ward employed counsel in an effort to expedite the perfecting of titles. According to Pearsall, between 1909 and 1918 he and Mr. Ward discussed matters of title to the lands, and not until 1918 did Ward indicate that he would refuse title.

The fact that summons in the present suit was not attempted until March, 1921, is explained by the circumstance that it was in March, 1919, that Mr. Ward wrote Pearsall authorizing him to sell the land and stating he would still be willing to carry out the proposal he had made with reference to the 2,000 acres. It was even as late as August, 1919, that Ward wrote to Pearsall that he was willing that the time for selling be deferred to January 1, 1921. Appellant argues that the contract was

abandoned, and in support of this quotes a letter written by Pearsall to a bank at Eureka, Cal., dated July, 1918, wherein Pearsall instructs the bank to deliver the deed to Ward upon payment of certain named sums, adding that he reserved the right to withdraw the deed if not taken up within 90 days. The fact is, however, that the deed was left in the possession of the bank continuously until the time of the trial, and was always available to Mr. Ward, to whom it was again tendered at the trial. The argument that Pearsall treated the land as his individual property is met by the evidence that Pearsall did not sell the land, never told Ward that he claimed it as his own, and was diligent in attempting to obtain legal redress after January, 1921, or at the expiration of the time mentioned by Ward during which Pearsall was to try to sell the land.

[2] There is a contention that Pearsall cannot recover because he did not acquire title before the decree, and that there was no mutuality of contract. But it is plain that from the beginning of Pearsall's efforts to compel Ward to perform a deed conveying good title from Pearsall's wife was held in continuing tender. The rule that mutuality of remedy, whereby from the time a contract is signed either party may by specific performance enforce against the other, is not applied in instances like this, where the parties to the contract well understood that the title was in another than the vendor at the time of the contract of sale. Under such a state of facts a tender of actual conveyance of title before or at the trial and before decree is sufficient to restore mutuality which will sustain specific performance. Day v. Mountin, 137 F. 756, 70 C. C. A. 190; Wolleson v. Coburn, 63 Cal. App. 315, 218 P. 479; Finnegan v. Summers (Ky.) 91 S. W. 261; Maryland Const., etc., v. Kuper, 90 Md. 529, 45 A. 197; McDonald v. Bach, 29 Misc. Rep. 96, 60 N. Y. S. 557; In Producers' Company v. Barlow, 189 Cal. 278, 208 P. 93, the Supreme Court of California said: "Undoubtedly a want of mutuality in the right to specific performance * * * may be removed, and is removed when there had been a full and substantial performance of the contract. * * * The substantial execution by plaintiff of its obligation would give present mutuality to the contract, although in its inception it lacked it."

[3] Another objection is based upon the fact that, when the title was finally estab-

lished by patents to the state of California in 1918-1919, title to such of the lands as came from the state was subject to a reservation of the right to fish, as provided for by section 25, article 1, of the Constitution of California, which reserves to the people a right to fish upon public lands of the state except upon certain lands reserved for fish hatcheries, and that no land shall be sold or transferred without reserving to the people an absolute right to fish thereupon. There is no force to the position, for the reason that when Ward and Pearsall made their contract both understood where the title was vested, and because the title, being in the United States, was subject to be acquired by the state, to be by the state transferred. Both had knowledge that the land was subject to such legislation of the state of California as might be subsequently enacted. Kuhn v. Freeman, 15 Kan. 423.

[4] The decree awarded interest from May 31, 1918. This is objected to. The contract contained no reference to interest. The last patent issued by the state was to Mrs. Pearsall for 80 acres, of date August 5, 1919, but there was no tender of an abstract with the first tender of the deed, July, 1918, and none until after the District Court decided that, inasmuch as Ward had repudiated the whole contract, Pearsall was under no obligation to tender an abstract at the time he offered, in May, 1918, to convey title, as such tender would have been futile. But the contract required Pearsall to turn over the tract with good and unincumbered title as soon as title to same was perfected and to furnish proper abstracts of title. Pearsall, however, did not clear up the title to the tract until trial of the case, and did not furnish abstracts of good and unincumbered title until after the trial, and after the District Court had made an order dated August 14, 1923, requiring him to deposit with the clerk of the court abstracts of title to the lands showing that the deed, when delivered, would convey good and unincumbered title. We therefore think that he cannot equitably claim interest on the purchase price prior to the time of the deposit of such abstracts and the date of the overruling of the objections by Ward to the title, which was December 17, 1923.

Our conclusion upon the main case is that the District Court was correct in ruling that the equities are with the plaintiff, and that the decree when modified as to interest is just.

3 F.(2d)—24

The order therefore is that the decree of the District Court be modified by awarding to plaintiff interest upon the principal sum from and after December 17, 1923, and as so modified is affirmed.