[No. 2906. March 30, 1926. Rehearing Denied
Jan. 5, 1928.]

ELEPHANT BUTTE ALFALFA ASS'N. v.
ROUAULT.

[262. Pac. 185.]

J. H. Paxton, of Las Cruces, for appellant.

H. B. Holt, of Las Cruces, for appellee.

### OPINION OF THE COURT

BICKLEY, J. The plaintiff, Elephant Butte Alfalfa Association, is a corporation organized under the laws of Texas known as the Co-operative Marketing Act, and, by compliance with the laws of New Mexico, authorized to do business therein.

Plaintiff brought suit against the defendant, T. Rouault, for the specific performance of a contract entered into between the plaintiff and defendant, in May, 1921, and for an injunction enjoining him from selling any of the alfalfa mentioned and described in the contract to any one other than the plaintiff, and for $300 damages for the alleged breach of said contract, and for expenses, attorneys' fees, and costs. The plaintiff is a co-operative marketing association, formed for the purpose of engaging in any activity in connection with the marketing and selling of alfalfa, including alfalfa nurse crops, alfalfa products, and alfalfa by-products of its members, and for the purpose of engaging in any activity in connection with the harvesting, preserving, drying, processing, packing, storing, handling, shipping, and utilization of the alfalfa, alfalfa products, and alfalfa by-products, and the manufacturing of alfalfa by-products, of its members, and for the purpose of engaging in any activity in connection with the manufacturing, selling, or supplying, to its members, of machinery, equipment, and supplies, and for the purposes of engaging in any activity in connection with the financing of the above-enumerated activities, and, so far as is authorized by said Co-operative Marketing Act, for the purpose of promoting, fostering, and encouraging the business of producing and marketing alfalfa, alfalfa products, and alfalfa by-products of its members, co-operatively, and for reducing speculation in, and for stabilizing alfalfa markets, and for co-operatively and collectively handling the problems of alfalfa growers, and for all purposes perti-

nent and incident thereto, and for the purposes of having and exercising all the rights, privileges, and powers granted to corporations organized under said Co-operative Marketing Act.

The Texas Co-operative Marketing Act was passed by the Legislature of the state of Texas in 1921, and is chapter 22 of the General Laws of Texas passed by the Thirty-Seventh Legislature. It is also compiled in Vernon's Ann. Civ. St. Supp. 1922, arts. 14½k-14½yy. The declaration of policy of the act is as follows:

"Section 1. *Declaration of Policy.* In order to promote, foster and encourage the intelligent and orderly marketing of agricultural products through co-operation and to eliminate speculation and waste; and to make the distribution of agricultural products as direct as can be efficiently done between producer and consumer; and to stabilize the marketing problems of agricultural products, this act is passed." Vernon's Ann. Civ. St. Supp. 1922, art. 14½k.

It is alleged that the association is composed of persons who are actual and individual farmers producing alfalfa, operating individual small farms, and actually and principally engaged in the production of alfalfa thereon, in large part by their own labors, untrained in the methods of commercial business, and without ability, means, or facilities for getting or keeping in touch with general market or production conditions, or for obtaining the full market value of their product, and thus, in their divided and unassociated, condition at the mercy of speculative dealers in such products; and said individual farmers producing alfalfa have organized, and are operating, the said plaintiff association as a nonprofit co-operative association without capital stock, for the purpose of promoting, fostering, and encouraging the business of producing and marketing alfalfa, alfalfa products, and alfalfa by-products of its members, co-operatively, and for reducing speculation in, and for stablizing alfalfa markets, and for co-operatively and collectively handling the problems of alfalfa growers, and for all purposes pertinent and incident thereto, such as procuring facilities for co-operative storage of their alfalfa at reasonable expense, and obtaining advances on their several crops co-operatively, cheaply, and safely, and that said individual farmers producing alfalfa have organized, and are operating, the said plain-

tiff association for no other purpose, and that all the members of said plaintiff association are such individual small farmers so producing alfalfa, and no corporation or other combination is a member thereof.

The contract itself purports to be an agency contract, and appoints plaintiff as agent of the defendant to market his product for his benefit, and without profit to the association. The periods covered by the contract include 1921 to 1925. The subject-matter of the contract is the sale and disposal of the alfalfa grown by and for the defendant. The complaint alleges that the defendant is a grower of alfalfa, and is a member of the association; that he entered into a contract with the plaintiff that he would consign or deliver to plaintiff or to plaintiff's order all of the alfalfa produced by or for defendant during the term of the contract for the co-operative marketing and handling thereof by plaintiff and the return to defendant of all his proportionate share of the proceeds of such co-operative marketing and handling, less his proportionate share of the actual expenses of such co-operative marketing and handling, and whereby the defendant also agreed to and with plaintiff to pay to plaintiff for all such alfalfa delivered, consigned, withheld, or marketed by or for defendant otherwise than to or through plaintiff the sum of $5 per ton as liquidated damages for such breach of said written agreement, the plaintiff and defendant agreeing that the said written agreement is one of a series dependent for its true value upon the adherence by defendant to said agreement. It is alleged that defendant has failed and refused to perform said contract, and that said defendant threatens to continue to disregard the obligation of his said agreement, and to deliver, sell, and consign alfalfa produced by him and for him to persons other than plaintiff, and otherwise than by marketing same through plaintiff, to plaintiff's great and irreparable injury and damage, by reason of the fact that the obligation of all similar contracts between plaintiff association and its members will thereby be relaxed, and the business of co-operative marketing involved in the organization and operation of said plaintiff will be totally destroyed, and by reason of the fact that the damages resulting therefrom

to the plaintiff association and its several members will be practically undeterminable in money value, and that plaintiff has no adequate remedy at law in the premises.

The complaint sets forth in verbatim a copy of the contract, which is essentially the same as co-operative marketing contracts usually employed.

The defendant demurred to the complaint upon the grounds "that same does not set forth allegations sufficient to constitute a cause of action." Several alleged defects are set forth, and those which are argued in the briefs appear in the course of this opinion. The trial court sustained the demurrer, and, plaintiff electing not to plead further, the court rendered judgment dismissing the cause.

The appeal from this judgment involves but a single question—whether or not the complaint states a cause of action. The objections urged by appellee against the sufficiency of the complaint and in support of the judgment are that the contract set out in the complaint is in restraint of trade, and against public policy, and therefore illegal; that the transactions provided for between the plaintiff and defendant do not constitute interstate commerce, and are therefore not within the purview of the federal statute pleaded by the plaintiff; that the contract in suit provided for the delivery by defendant to the plaintiff of an ordinary article of commerce, a chattel, and that specific performance cannot be had by the plaintiff; that the complaint does not state facts which entitle the plaintiff to injunctive relief.

Appellee urges that the contract violates the provisions of sections 1685, 1686, and 1687, 1915 Code. These sections are as follows:

"1685. * * * Every contract or combination between individuals, associations or corporations, having for its object or which shall operate to restrict trade or commerce or control the quantity, price or exchange of any article of manufacture or product of the soil or mine, is hereby declared to be illegal.

"Every person, whether as individual or agent or officer or stockholder of any corporation or association, who shall make any such contract or engage in any such combination, shall be deemed

guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding one thousand dollars nor less than one hundred dollars, and by imprisonment at hard labor not exceeding one year, or until such fine has been paid.

"1686. * * * Every person who shall monopolize or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce of this state, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding one thousand dollars or by imprisonment not exceeding one year, or by both said punishments in the discretion of the court.

"1687. * * * All contracts and agreements in violation of the foregoing two sections shall be void, and the person or persons, corporation or corporations, association or associations who shall violate the provisions of either of said sections shall be civilly liable to the party injured for any and all damage occasioned by such violation, and any purchaser of any commodity from any individual, corporation or association transacting business in violation of such sections shall not be liable for the payment of such commodity."

Appellee also relies upon the following cases:

Reeves v. Decorah Farmers' Co-op. Society, 160 Iowa, 194, 140 N. W. 844, 44 L. R. A. (N. S.) 1104. In this case the court held that the corporation was organized for pecuniary profit, that the acts complained of would be in undue restraint of trade. The court does not consider the question of the effect of the fact that defendant was a farmers' association, but treats the case as it would any other where the facts show a restraint of trade and apparently no statute existed in Iowa authorizing co-operative marketing associations. However, the court says:

"Of course, a mere selling agency is not a monopoly, and neither the common law nor the anti-trust statutes apply to a genuine selling agency."

As this decision has been quoted in many courts by those who oppose co-operative marketing, and is a leading case from their viewpoint, it is worth while to recite further criticism of that decision found in an article by Aaron Sapiro, an eminent authority, in the Iowa Law Bulletin, No. 8, vol. No. 4, pp. 206, 208, 209:

"In Reeves v. Decorah the defendant society was an organization of farmers, incorporated under the general laws of the state for pecuniary profit, its primary purpose being to sell hogs belonging to members of the society. One of the by-laws contained a provision whereby any member or stockholder who preferred to sell

his produce or live stock to a competitor should forfeit to the company 5 cents for every hundredweight sold a competitor. The society was also allowed to purchase products in the open market from both members and nonmembers. To be sure, it would divide profits, if any, at the end of the year, on a patronage basis. But this is simply profit sharing, not co-operation.

"The following reasons, therefore, appear why the society was not a true co-operative association:

"(1) It bought and sold any and all kinds of merchandise.

"(2) It was organized for pecuniary profit.

"(3) Some stockholders were not farmers at all, and some were not hog raisers.

"(4) It bought from, and sold to, both members and nonmembers, always on a profit basis.

"(5) It operated on the open market.

"(6) Furthermore, a stockholder was penalized if he sold produce to a competitor of the society. But he was allowed to sell to competitors if he so desired; only in so doing he incurred a penalty, all at his discretion and preference.

"The court, in its decision, pointed out the difference between this society, which operated in buying and selling on the open market, and a mere selling agency. * * *

"These cases were decided a decade ago, before the Legislatures of twenty-three states had declared the public policy of these states by enacting co-operative marketing acts providing for true co-operative marketing associations along the lines heretofore mentioned. They were decided prior to the enactment of the Capper-Volstead Act, passed by the Congress of the United States in 1922, providing that farmers engaged in interstate commerce might form marketing associations subject to some certain limitations, viz. either, one man one vote, or no dividends in excess of 8 per cent., and that they should not deal in products of non-members to an amount greater than handled by it for members. They were also decided before the decisions of the Supreme Court of the United States in United States v. American Tobacco Company, and Standard Oil Company v. United States, and United States v. United States Steel Corporation, which are the last word on the subject from the court of highest authority in the land, holding that neither mere size nor the existence of unexerted power was an offense against the Anti-Trust Acts. These cases also recognized the rule of reason in that agreements reasonably necessary for the protection of the business involved were announced to be in accord with modern business methods and sound public policy." Ford v. Chicago Milk Shippers' Association (1895) 155 Ill. 166, 39 N. E. 651, 27 L. R. A. 298.

In this case upon hearing the evidence, etc., the court found that the association "fixes and determines the price of milk in Chicago." In Brown v. Staple Cotton Co-op.

Ass'n., 132 Miss. 859, 96 So. 855, the Mississippi Supreme Court, in reviewing this decision, says of the association that it was organized as a price-fixing association without regard to market conditions, and therefore was held illegal.

Appellee cites People v. Sheldon (1893) 139 N. Y. 251, 34 N. E. 785, 23 L. R. A. 221, 36 Am. St. Rep. 690, and Cummings v. Blue Stone Co. (1900) 164 N. Y. 401, 58 N. E. 525, 52 L. R. A. 262, 79 Am. St. Rep. 655. With reference to these cases it is sufficient to say that the later case of Bullville Milk Producers' Assn., Inc., v. Armstrong (September, 1919), 108 Misc. Rep. 582, 178 N. Y. S. 612, is in line with the modern idea of co-operative marketing. The court says:

"In regard to the other point raised by plaintiff, it seems to me that the agreement in question constitutes a valid and binding contract, and is not void as being against public policy or in restraint of trade. The incorporators of this association desired to engage in the business of shipping milk, and it was quite necessary that they be assured of the continued patronage of their members in order to justify the association in going to the expense of acquiring or erecting a creamery. It cannot be said that an agreement such as this would tend to restrain trade or stifle competition; on the contrary, it seems to me that it encourages competition by bringing a new creamery into being."

Likewise, in Castorland Milk & Cheese Co. v. Shantz (Sep. 1919) 179 N. Y. S. 131, the court decided:

"Contract by dairymen to deliver all their milk to creamery established by them does not offend the law, as being an illegal monopoly or an unreasonable restraint of trade."

With respect to Gus Fiest Co. v. Albertype Co. (Tex. Civ. App. 1908) 109 S. W. 1139, cited by appellee, it is enough to say that it is not in line with the current of recent decisions involving facts like those in the case at bar, and Texas has joined the other states, and has provided for co-operative marketing. See Vernon's Ann. Civ. St. Supp. 1922, arts. 14½k-14½yy.

And in the case of Texas Farm Bureau Cotton Association v. Stovall (1923) 113 Tex. 273, 253 S. W. 1101, reversing (Tex. Civ. App.) 248 S. W. 1109, it appears that the defendant, a member of the plaintiff association, which was incorporated under the act last mentioned,

promised to sell and deliver to the plaintiff all cotton which he should raise or acquire during the next five years, the plaintiff promising to buy, grade, and inspect all such cotton, and to market it at such time and in such manner as, in its discretion, should bring the best price therefor, and to prorate the proceeds of all sales to the defendant on the basis of his deliveries. The agreement stated that it was one of a series which constituted a single contract between the plaintiff and all its members. The defendant threatened to sell cotton in violation of his agreement, and the plaintiff sued for specific performance and an injunction. Order dismissing the bill was affirmed on the grounds that the agreement was void for want of consideration and certainty, and found that it was specifically unenforceable because it lacked mutuality of remedy, and because specific performance would require continuous supervision. The plaintiff appealed, and it was held that the contract was specifically enforceable, regardless of the statute. The court said:

"Aside from the statute, the plaintiff in error, because of the contract and the nature of its business as a co-operative concern without capital stock, would be entitled to equitable relief. Oregon Growers' Co-operative Ass'n. v. Lentz [107 Or. 561] 212 P. 811; Washington Cranberry Ass'n. v. Moore, 117 Wash. 430, 201 P. 773, 204 P. 811 [25 A. L. R. 1077]; Grant County Board v. Allphin, 152 Ky. 280, 153 S. W. 417; Phez. v Salem Fruit Union, 103 Or. 514, 201 P. 222, 205 P. 970 [25 A. L. R. 1090]; Owen County Society v. Brumback, 128 Ky. 137, 107 S. W. 710; Tobacco Growers' Co-operative Ass'n. v. Jones [185 N. C. 265] 117 S. E. 174 [33 A. L. R. 231]."

The Texas act in question was attacked as being in restraint of trade, and hence illegal, but was upheld by the Texas Court of Civil Appeals in Hollingsworth v. Texas Hay Ass'n. (1923) 246 S. W. 1068.

Appellee cites Georgia Fruit Exchange v. Turnipseed (1913) 9 Ala. App. 123, 62 So. 542. Yet in Alabama co-operative marketing agreements are upheld under a statute of that state. See Ex parte Baldwin County Producers' Corp., 203 Ala. 345, 83 So. 69. The Supreme Court of Mississippi, commenting on this case in Brown v. Staple Cotton Co-op. Ass'n., 132 Miss .859, 96 So. 855, says:

"Ga. Fruit Exchange v. Turnipseed,, supra, was decided by an intermediate court of appeal of Alabama, therefore Ex parte Baldwin County Producers' Ass'n., supra, holding to the contrary, which was decided by the Supreme Court of Alabama, is controlling."

Of Gay v. Brent, 166 Ky. 833, 179 S. W. 1051, cited by appellee, the Mississippi Supreme Court in the same case said that this case "involved an agreement or understanding by which the parties to the contract· sought to absolutely control the price of blue grass seed in Kentucky, which state produced 90 per cent. of the blue grass seed of the world. Clearly such a scheme was illegal." We concur in this appraisal of that decision, and we further observe that the case was decided upon a demurrer to the answer which pleaded· that the purpose of the agreement "was to control blue grass seed market and create a monopoly in unreasonable and unlawful restraint of trade, and to thereby increase the cost of blue grass seed to the public." We cannot give much weight to the cases cited by the appellee on this proposition.

 Going back, then, to the New Mexico statutes heretofore quoted, it must be conceded that that statute put a restriction upon combinations in restraint of trade, and signified the public policy of the state of New Mexico at the time of its enactment. But it must also be conceded that the public policy of a state may change, and such changes may be discoverable from the decisions of its courts and the acts of its Legislature.

In the case of Burley Tobacco Society v. Gillaspy, 51 Ind. App. 583, 100 N. E. 89, is a fine discussion of public policy, how it is formed and how manifested, and the court concludes:

"In the later case of Commonwealth v. Hodges (1910) 137 Ky. ·233, 246, 125 S. W. 689, the court said: 'The conditions which gave rise to the act are known to all men. At the time of its enactment there was but one buyer for the farmer's tobacco. It mattered not how hard he labored, how valuable his soil, or how fine the quality of the crop he raised, he was obliged to accept whatever that buyer might offer. Indeed, in many instances the buyer absolutely refused even to examine his crop, or to make any offer at all. Instead of the plenty to which he was accustomed, and to which he was entitled, he stood face to face with privation and want. As individuals the farmers were unable to cope with the situation.' While these cases carry the rule of judicial knowl-

edge far, it is clearly the law that courts will take judicial cognizance of the history of the country and of the facts of common knowledge which go to make up such history. To hold that courts do not judicially know that in the year 1909 there was in this country a combination among the manufacturers of tobacco, which controlled the leaf tobacco market, and known as 'the Tobacco Trust,' would be to impute to courts a lack of knowledge possessed by the public generally. Moreover, the authorities seem· to recognize an exception in cases presenting facts similar to the facts averred and judicially recognized in the case before us. In Greenhood, Public Policy, 645, the rule is laid down that combinations to raise prices to a reasonable point are valid among men engaged in business which has become ruinous, especially when their operation is limited in every essential particular. This court, in the well-reasoned case of Over v. Byram Foundry Co. (1906) 37 Ind. App. 452, 77· N. E. 302, 117 Am. St. [Rep.] 327, held that every case involving the question of public policy and restraint of trade must be decided on its own facts.

"Assuming, as we must, that the demurrer to the complaint admits the truth of. all facts well pleaded, there· is no averment in the complaint or provision in the contract disclosing that appellant by means of the pool proposed to sell the tobacco of appellee for a sum greater than its true and actual value. As we have seen, all presumptions will be indulged in favor of the legality of a contract, and such presumptions will only yield when its illegal character plainly appears.

"In this case, we think it may be admitted that the contract in suit was executed in furtherance of a combination in restraint of trade by the growers of Burley tobacco, the market for which was controlled by a trust, but the purpose of the combination does not appear to be other than to secure a fair and adequate price for the growers' product. We think such acts could· not be held to be in conflict with the morals of the time, or to contravene any established interest of society. Public policy does not ask those who till the soil to take less than a fair return for their labor. Public policy safeguards society from oppression; it is not an instrument of oppression.

"If the complaint does not state the truth, that is not a matter of present concern. We only hold that the complaint as it comes to us is sufficient to put appellee to answer, and the issue may then be determined as one of fact and not as one of law."

Appellant claims that only combinations and contracts as are in unreasonable restraint of trade are illegal under the anti-trust statutes or as against public policy. It cites a number of authorities upholding such contention, but it is not necessary to go beyond the decisions of our own court for authority on that proposition. In 1919 in the case of State v. Gurley, 25· N. M. 233, 180 P. 288, we construed the sections of our statutes above quoted. In that case, Gurley was indicted for unlawfully entering

into a contract for restraint of trade. The contract is set out in the indictment. Defendant demurred to the indictment, which demurrer was sustained by the trial court. On appeal the decision was affirmed. The court said:

"The indictment was returned under the provisions of sections 1685 and 1686, Code 1915. To this indictment the defendant demurred upon the ground, among other things, that the indictment was insufficient and does not as a matter of law constitute the crime of unlawfully and feloniously entering into a contract to restrict trade and commerce. The demurrer was sustained, and it is from this order sustaining the demurrer that the state has appealed. * * *

"The only question to be decided in this case is whether such a contract as is set out in the indictment violates the statute against restraint of trade and monopolies. We have investigated the subject thoroughly, and have been unable to find a statute exactly like our own, but our statute is similar to the federal Anti-Trust Law (Sherman Act July 2, 1890, c. 647, 26 Stat. 209, U. S. Comp. St. § 8820 et seq.) and numerous other so-called anti-trust laws of the various states. Contracts alleged to have been in restraint of trade, and which tended to monopolize, have been the subject of much litigation. The courts have applied various tests to determine whether such contracts were within the inhibition of the statute. They have sought to ascertain whether such contracts were in total or partial restraint of trade, holding those in partial restraint to be valid and those in total restraint invalid. 'Restraint of trade,' as the phrase is used in these decisions, sometimes is applied to the time for which the contracts were to run, and sometimes is applied to the territory throughout which the contracts were intended to operate.

"The Supreme Court of the United States, in the case of Standard Oil Co. v. United States, 221 U. S. 1, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, finally determined that contracts in restraint of trade and contracts which intended to monopolize to be within the inhibition of the statute must be in unreasonable restraint of trade. This test is unsatisfactory. 'Obviously, however, so broad and general a test is incapable of very close application; each case that arises being left to be decided upon its own merits and upon the particular circumstances developed.' Cooke on Combinations, par. 133.

"Applying these principles to the case at hand, we are of the opinion that such a contract as is set out in the indictment is not one forbidden by the statute in question. The rule of reason means to unreasonably restrict or restrain trade."

■ The public policy of New Mexico was further indicated by the passage of an act by the Legislature of New Mexico in 1915, being "An act for the organization, management, and co-operation of agricultural, viticultural

and horticultural nonprofit co-operative associations."
Laws 1915, c. 64. The act provides that three or more
persons engaged in the production, preserving, drying,
packing, shipping, or marketing of agricultural, viticul-
tural, or horticultural products, or all of them, may form
a nonprofit co-operative association, under the provisions
of this act to carry on said business, and such association
shall have, and may exercise, the powers authorized by
this act and powers necessarily incidental thereto, and all
other powers granted to private corporations by the laws
of this state, except such powers as are inconsistent with
those granted by this act. That such association shall not
have a capital stock and its business shall not be carried
on for profit. Any person, or any number of persons, in
addition to the original incorporators, may become mem-
bers of such association upon such terms and conditions
as to membership and subject to such rules and regulations
as to their, and each of their, contract and other rights
and liabilities between it and the member, as said associa-
tion shall provide in its by-laws, and provision is made
for the manner of the incorporation and management of
such associations, and, in addition to the powers here-
tofore mentioned, shall have other powers therein pro-
vided. While this act of the New Mexico Legislature is
not as voluminous, and does not possess all of the pro-
visions of some of the later co-operative marketing acts,
its purpose seems to be essentially the same as acts of
other states having the same objects in view. The pur-
poses and objects of this act were further fortified by the
New Mexico Legislature in 1923, which provided in sec-
tion 67 of chapter 25 of the session laws thereof that—

"Any corporation organized and existing under and by virtue of
chapter 64 of the Session Laws of New Mexico 1915, or farm-
ers' union, or farmers' exchange, or other co-operative associa-
tion, is hereby expressly authorized and empowered to act as a
warehouseman for the storage of products of its members, but
shall be subject to each and every provision of this act as fully
as were it a corporation for profit."

Also, in 1921, the Legislature, by chapter 93 of the
session laws of that session, provided for virtual monopo-
lies of certain public utilities, such as telephone service,
production, transmission, and delivery or furnishing of

gas or electricity for heat, light, or power, such monopoly to be curtailed only when upon hearing in the district court it is determined that public convenience and necessity require such curtailment.

The policy of the state is further indicated by the act of the New Mexico Legislature approved March 5, 1923, entitled:

"An act excepting labor, agricultural and horticultural organizations, instituted for mutual help and not conducted for profit, from the operation of laws against monopolies and combinations in restraint of trade, and for other purposes."

This act appears as chapter 37, Laws of 1923, and section 1 thereof is as follows:

"Section 1. The labor of a human being is not a commodity or article of commerce. No law against monopolies or combinations in restraint of trade shall be held or construed to forbid the existence and operation of labor, agricultural or horticultural organizations, instituted for purposes of mutual help, and not having capital stock or conducted for profit to the organization, or to forbid or restrain individual members of such organizations from lawfully carrying out the objects thereof; nor shall such organizations or the members thereof be held or construed to be illegal combinations or conspiracies in restraint of trade under any law against monopolies or combinations in restraint of trade; provided, however, that nothing herein contained shall be held or construed to justify any restraint of trade or restriction of competition except such as is incident to the protection and promotion of the interests of the members of such organizations, in view of their situation and circumstances; but such organizations and their objects, and the effectuation thereof, shall prima facie be presumed to be in reasonable restraint of trade or restriction of competition."

At present such co-operative marketing laws, essentially alike in detail, are in force in more than 36 states. By way of general observation concerning such associations, we quote from an article in volume 38 of Harvard Law Review, p. 87, November, 1924:

"The tremendous increase in recent years in the importance and scope of co-operative marketing associations has brought to the fore questions of their legality as combinations in restraint of trade, or as organizations tending toward monopoly. A Wisconsin association, organized under a typical co-operative marketing association statute, has recently been held legal, and the Wisconsin act exempting such organizations from the operation of the state anti-trust laws held not to violate the 'equal protection' clause of the Fourteenth Amendment.

"At the early common law, any contract in restraint of trade

was regarded as void. But changing economic conditions led to altered legal conceptions, until today, under the federal and state anti-trust laws, it seems that monopoly or restraint are objectionable only when they actually result in unduly enhancing prices, limiting production, and lowering quality. Mere size alone, and the latent though unexercised power to restrain trade, do not constitute a violation of the anti-trust laws.

"Experience with co-operative marketing associations has already demonstrated the fact that these organizations do not bring about these evils. Economies in transportation and the elimination of the profits of a series of middlemen permit a higher return to the producer without increasing the price to the consumer; the increased demand created by extensive advertising, notably of standard brands of fruit, have led to vast increases in production, while scientific merchandising methods have evolved a standardized and graded product, with constant improvement in quality. But some early cases, looking merely at the fact that the continued existence of a co-operative association necessarily depends on the binding of its members by contract not to sell to outside buyers, held such associations illegal under the anti-trust laws. In more recent years, a few courts have reached the opposite result under commonlaw principles.

"The farmer has not been left to the mercy of the courts, however. The imperative necessity for co-operative marketing has led to elaborate legislation designed to encourage the formation of co-operative associations from the operation of the anti-trust laws. At present, such laws, essentially alike in detail, are in force in thirty-six states; and the Capper-Volstead Act of 1922 authorizes farmers to 'act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce' agricultural products. When co-operative associations organized under these recent state laws have been attacked as being in restraint of trade and hence illegal, the cases have thus far uniformly upheld the associations. The decisions proceed on two main grounds: (1) That the associations are not in fact exercising an unreasonable restraint; or (2) that the statutes modify the policy of the general anti-trust laws with reference to restaint by such associations."

The following is a quotation from "Marketing and Distribution" Report of the Joint Commission of Agricultural Inquiry, Sixty-Seventh Congress, First Session, No. 408, pp. 229, 230:

"* * * The success of co-operative associations probably lies more generally in the organization of farm production and standardization of farm products, thus reducing the varieties and grades of farm production to a more standard basis and reducing cost of distribution all along the line. It seems altogether likely that the co-operative association cannot succeed as a holding corporation for the purpose of withholding the crops from the market to establish an artificial price."

"The success of co-operation cannot rest upon the establishment of artificial control of prices. It must rest rather upon the association's ability to perform the necessary service more efficiently and with greater advantage both to, the producer and to the general public than the service is now performed by existing agencies."

"The commission believes the economic limitations inherent in agricultural production and co-operative organizations for the sale of such products fully negatives the wrongful use of such power as collective organizations of farmers might possess."

The writer of the article in Harvard Law Review, supra, draws the following conclusion from the report of the Joint Commission, supra, pp. 3-7, that—

"The losses on the part of the farmers under the older system of individual marketing were due to (1) unskillful grading, which leads to rejection of part of a shipment, and consequent loss, in the case of perishables, of the rejected portion, including the price of transportation to the market; (2) direct losses from unskillful packing; (3) inadequate terminal facilities; (4) congestion of local markets, particularly in the case of the more perishable articles; (5) direct competition between local producers dumping at the same time in a local market. See Report of the Joint Commission, supra, 3-7."

It is these elements which go to show that monopoly is not the purpose of such associations, and that the purpose of overcoming these losses is justified even though a certain degree of monopoly might follow, so long as such degree of monopoly is not shown to be against the public interest. As above quoted, when co-operative associations organized under these recent state laws have been attacked as being in restraint of trade, and hence illegal, the cases thus far uniformly uphold the associations. See Ex parte Baldwin County Producers' Corp. (1919) 203 Ala. 345, 83 So. 69; Poultry Producers of So. Cal. v. Barlow (1922) 189 Cal. 278, 208 P. 93; Anaheim Citrus Fruit Ass'n. v. Yeoman (1921) 51 Cal. App. 759, 197 P. 959; Burley Tobacco Soc. v. Gillaspy (1912) 51 Ind. App. 583, 100 N. E. 89; Kansas Wheat Growers' Ass'n. v. Schulte (1923) 113 Kan. 672, 216 P. 311; Owen County Burley Tobacco Soc. v. Brumback (1908) 128 Ky. 137, 107 S. W. 710; Oregon Growers' Co-op. Ass'n. v. Lentz (1923) 107 Or. 561, 212 P. 811; Tobacco Growers' Co-op. Ass'n. v. Jones (1923) 185 N. C. 265, 117 S. E. 174, 33 A. L. R. 231, Hollingsworth v. Texas Hay Ass'n. (Tex. Civ. App. 1923) 246 S. W. 1068; Pierce County Dairymen's Ass'n. v. Templin (1923) 124 Wash. 567, 215, P. 352;

Northern Wisconsin Co-op. Tobacco Pool v. Bekkedal (1924) 182 Wis. 571, 197 N. W. 936. See Brown v. Staple Cotton Growers' Co-op. Ass'n. (1923) 132 (Miss. 859, 96 So. 849.

The student of the historical background of such association will find an excellent discussion in Tobacco Growers' Co-op. Ass'n. v. Jones, 185 N. C. 283, 117 S. E. 182, 33 A. L. R. 231. In that case the court also said:

"In U. S. v. Steel Corporation, 251 U. S. 417, 40 Sup. Ct. 293, 64 L. Ed. 343, 8 A. L. R. 1121, it was held that, when a court was asked to dissolve a corporation because in violation of the Sherman Anti-Trust Act (U. S. Comp. St. secs. 8820-8823, 8827-8830), it must consider, not whether the corporation has the power to do so, but what it has done and is doing, for that act is directed against monopoly, and not against an expectation of it, and where the corporation did not achieve monopoly, and only has attempted to fix a protective schedule of prices, and has not been detrimental to the public interest, or proven to be in restraint of trade, it will not be held illegal."

Without quoting at length from numerous decisions, we think the argument as contained in Northern Wisconsin Co-op. Tobacco Pool v. Bekkedal, 182 Wis. 571, 197 N. W. 936, is applicable to the case at bar, and we therefore quote from that decision:

"Appellants' contention that plaintiff constitutes a monopoly and an unlawful combination in restraint of trade, condemned by section 1747e, is based on the following considerations: (1) The contract is not to take effect until 75 per cent. of the growers of tobacco in Wisconsin signed similar contracts; (2) the provision in the contract that the member will pay to the association the sum of 5 cents per pound for each pound of tobacco produced, but not delivered by him according to the provisions of the contract; (3) that the admitted purpose and conduct of the plaintiff was to combine at once 100 per cent. of the growers in Wisconsin, and obtain a complete monopoly; (4) that the Wisconsin tobacco crop is peculiarly subject to monopolization, because of its distinctive quality; (5) that the plaintiff pool established a price upon its crop which was a monopoly price, as appears by the fact that the price once fixed by the pool was to continue for the whole season, and the prices fixed by the pool were regarded by it, due to its control over the market, as the market price, and anything beyond was classed by it as in excess of the true market price so fixed; (6) that the plaintiff acquired such monopolistic control over the tobacco crop of Wisconsin as to be able to disorganize, in its first season, the entire distribution and marketing system of tobacco in this state; and (7) that the plaintiff acquired such monopolistic control over the tobacco crop in Wisconsin as to be able to exercise monopolistic discrimination in the distribution of the Wisconsin tobacco crop among the buyers of tobacco.

"A number of the propositions thus laid down by the appellants are not without dispute in the evidence. But for the present, at least, we shall assume these several propositions as verities. From the premises so laid down appellants proceed with the discussion on the assumption that the situation is governed entirely by the provisions of section 1747e, which is our statutory condemnation of contracts or combinations in the nature of a trust or conspiracy in restraint of trade or commerce. It is to be conceded that for a long time the public policy of that state was in accordance with this statutory declaration, and probably such would have been the public policy of the state in the absence of such statutory declaration, as the statute in question adds very little to the condemnation visited upon such agreements at common law. It is not to be denied, however, that the public policy of the state with reference to such combinations and agreements is within the control of the * * * legislative control and modification. Thus, in Pulp Wood Co. v. Green Bay P. & F. Co., 168 Wis. 400, 412, 170 N. W. 230, 235, it was said:

" 'It may be well that the time is approaching, if not already here, when monopolies or business combinations controlling the market (subject, however, to efficient government control) will be found more desirable than unrestrained competition; but that is a question for the lawmaking power to decide, not for the courts.'

"Such combinations and agreements have been condemned by the law, because their existence was regarded as prejudicial to the public interest. If in the course of time changing conditions should give rise to economic views and public opinion wiping out the prejudice hitherto entertained with reference to such combinations, and they should come to be regarded as beneficial, rather than injurious, to the public interest, there is no doubt of the power of the Legislature to completely reverse the public policy of the state with reference to such combinations and agreements, and to promote rather than suppress the same. So, also, if the Legislature should conclude that some combinations are injurious, while others are beneficial, to the public interest, no reason is perceived why the injurious combinations may not be prohibited, and the beneficial combinations encouraged; due regard being had, of course, to the legal requirements concerning proper and germane classifications.

"Since the enactment of section 1747e, condemning every contract or combination in unreasonable restraint of trade, legislation has been enacted providing for the incorporations of co-operative corporations, or associations, as they are called. The plaintiff is organized under such statutory provisions (sections 1786 e-1 to 1786 e-17a, inclusive). Such legislation specifically provides:

" 'Any number of adult persons, not less than five, who are residents of this state, may organize as a co-operative association, for the purpose of conducting any agricultural, dairy, mercantile, mining, manufacturing or mechanical business on the co-operative plan, or of acting as a selling or buying agent for its members or patrons.'

"Paragraph 2 of section 1786 e-7, already quoted herein, would seem to authorize every provision of the contract here in question. Under contracts so authorized, members may agree to sell

all or a specified part of their products to or through, or to buy all or a specified part of goods from or through, the association or any facilities created by the association and such contracts, if otherwise lawful, shall be valid. Such contracts shall not exceed five years, but they may be made self-renewing for periods. not exceeding five years. The same paragraph also specifically provides that the contracts may contain a provision for liquidated damages in case of their breach. Every provision of the contract here in question which it is claimed constitutes a restraint of trade is specifically authorized by this legislation.

"This legislation, being enacted subsequent to the enactment of our general anti-trust statutes, must be considered as modifying the scope of the former, and the validity of plaintiff's contracts, or the effect of their operation so far as they constitute a restraint of trade, is not to be tested by the provisions of section 1747e, or court decisions condemning contracts under similar legislative provisions. This legislation providing for the organization of co-operative associations manifests a clear purpose on the part of the Legislature, not only to authorize, but to encourage, co-operative effort along the lines to which the legislation is made applicable, and to legalize practices which no doubt were of questionable validity prior to the enactment of such legislation.

"The reasons for promoting such legislation are generally understood. It sprang from a general, if not well-nigh universal, belief that the present system of marketing is expensive and wasteful, and results in an unconscionable spread between what is paid the producer and that charged the consumer. It was for the purpose of encouraging efforts to bring about more direct marketing methods, thus benefiting both producer and consumer, and thereby promoting the general interest and the public welfare, that the legislation was enacted.

"We therefore hold that the validity of the plaintiff organization and its operations must be tested, not by the former public policy of this state with reference to combinations and agreements in restraint of trade, as declared by section 1747e, but by the provisions of the co-operative association statutes. So far as the contract is concerned, it seems to be in conformity with those provisions. The statutes specifically provides that any number of persons may organize as a co-operative association. This language negatives any legislative purpose to limit the number of persons that may so organize, and the fact that 75 per cent. or even 100 per cent. of the tobacco growers of the state affiliated with this association does not render its organization illegal or its operations unlawful. It may be and probably is true that the organization and operation of this association had a very serious effect upon defendants' business in the various respects above set forth, but it is to be remembered that the very purpose of the legislation was to bring about a different system of marketing, which must of necessity injuriously affect middlemen (and such is the Bekkedal firm). The effect of the operation of such associations upon business in general cannot be considered in determining the legality thereof or their operations, because the public policy which formerly condemned them now encourages their existence and operation. If they have no. effect upon busi-

ness as heretofore existing and conducted, then their existence and operation, as well as the legislation promoting them, is futile and to no purpose. The effect of similar legislation upon prior existing public policy is considered in Tobacco Growers' Co-operative Association v. Jones, 185 N. C. 265, 117 S. E. 174 [33 A. L. R. 231]; Brown v. Staple Cotton Co-operative Association [132 Miss. 859] 96 So. 849; Hollingsworth v. Texas Hay Association (Tex. Civ. App.) 246 S. W. 1068; Poultry Producers of Southern California v. Barlow, 189 Cal. 278, 208 P. 93—all of which are in harmony with the conclusions we have reached."

On rehearing, the decision was fortified by further strong argument.

What is said of the effect of the later Wisconsin legislation upon prior existing public policy as evidenced by the antimonopoly statutes applies with equal force to the legislation in New Mexico in 1915 and 1923, which we consider a modification of the earlier statutes (sections 1685, 1686, and 1687, 1915 Code).

In a case decided March 1, 1926, the Colorado Supreme Court had under consideration Mountain States Beet Growers' Marketing Association v. Wagner, 79 Colo. 604, 247 P. 804, wherein the contract was attacked, among other grounds, that it was—

"3. In violation of the Colorado Anti-Trust Act.

"4. Contrary to the settled public policy of the state."

And the court said:

"The third and fourth grounds may be eliminated in like manner, because, in Rifle Potato Growers v. Smith, 78 Colo. 171, 240 P. 937, we have held that, if the acts are inconsistent, the Marketing Act controls the Anti-Trust Act and that the Legislature has power to change and by the Marketing Act has changed the public policy of the state."

The demurrer having admitted as true all of the facts well pleaded in the complaint, we are unable to draw therefrom a conclusion that the purpose of the contract is illegal under sections 1685, 1686, and 1687 of the 1915 Code, as heretofore construed by our court and as modified by subsequent legislation. The contract which has been set up in full is typical of such contracts, and is similar to the agreement set out in full in Oregon Growers' Co-op. Ass'n. v. Lentz (1923) 107 Or. 561, 212 P. 811, and almost identical with the one set forth in Texas

Farm Bureau Cotton Ass'n. v. Stovall (1923) 113 Tex. 273, 253 S. W. 1101. In the first of the last two cases cited, the court said:

"The defendant contends that the contract itself is an unlawful' contract, in that it is a contract for a combination or conspiracy in restraint of trade, and that its enforcement would create a monopoly. On its face the contract is legal. The presumption is that all contracts are legal and not illegal. As the contract was legal cn its face, if the defendant, when sued for a breach of it, had desired to attack its legality, he should have both alleged and proved its illegality, and in his proof he should have shown how and why it was unlawful. City Ice Co. v. Easton Merchants' Ice Co., 267 Pa. 500, 110 A. 350. Although the defendant, in order to raise this question, was required to do both of these things, he has done neither. Here we have a valid contract, the making of which was specially authorized by statute, and the remedy at law for its enforcement was inadequate."

See, also, Burley Tobacco Society v. Gillaspy, supra, to the same effect, and also Anaheim Citrus Fruit Ass'n. v. Yeoman, 51 Cal. App. 759, 197 P. 959, where the court said:

"There is nothing in the articles of incorporation of the plaintiff or its by-laws, or in the evidence of its methods, which tends to show that any purpose of the association was to do acts in restraint of trade or produce an unlawful monopoly. * * * It will not be inferred, without proof of the fact, that an organization, the purposes of which appear to be legal and legitimate on their face, is actuated by a hidden design to operate in a way that is prohibited by law."

It is urged by appellee that the transactions provided for between the plaintiff and the defendant do not constitute interstate commerce, and therefore are not within the purview of the federal statute pleaded by plaintiff.

There being both a state and national law which would authorize such a contract, the one law relating to intrastate and the other to interstate commerce, it is immaterial as to which character of commerce, whether only one or both, is involved in the contract here under consideration.

█ █ Appellee urges that specific performance cannot be had by plaintiff because the contract provides for the delivery by defendant to the plaintiff of an ordinary article of commerce, and that the contract stipulates for a succession of acts whose performance cannot be consummated by one transaction, but will be continuous, and

require protracted supervision and direction, and that such contracts are not as a general rule specifically enforced. Appellee cites in support of this contention several authorities, among them 25 R. C. L., Specific Performance, p. 293, § 103. It is true that text declares that—

"A court of equity will not order the specific performance of a contract for a sale of personal property, because, ordinarily, there is an adequate remedy at law."

The author proceeds, however, to say that:

"The interposition of equity is, however, not withheld except upon this particular ground, as its jurisdiction is as ample to decree the specific performance of an agreement relative to personalty as it is one relative to realty. But while contracts relating to real estate are enforceable in equity almost as a matter of course, those respecting personalty are enforced only under proof of circumstances showing the case to be one appropriate for equitable relief. Contracts which relate to real property can necessarily be satisfied only by a conveyance of the particular estate or parcel contracted for, while those which relate to personal property are often fully satisfied by damages which enable the party injured to obtain elsewhere in the market property precisely similar to that which he had agreed to purchase. The exercise of equity jurisdiction therefore does not proceed upon any distinction between real estate and personal estate, but depends on the question whether damages at law may not in the particular case afford a complete remedy. If from the nature of the case an adequate remedy at law does not exist and the plaintiff stands in need of specific relief, chancery will entertain jurisdiction to enforce the contract."

Gillett v. Warren, 10 N. M. 523, 62 P. 975, cited by appellee, did not decide that the fact that the property involved was personal property was determinative of the question, but that, under the facts of that case, the party seeking specific performance had an adequate remedy at law. Among the allegations of the complaint in the case at bar is the following:

"That defendant is a member of the plaintiff association; and that the co-operation of all the members of the plaintiff association, and the performance by defendant of his said written agreement, hereinbefore alleged, are necessary and indispensable to the accomplishment of the said purpose of the said association, hereinbefore alleged; and that defendant threatens to continue to disregard the obligation of his said written agreement, and to deliver, sell, and consign alfalfa produced by and for him to persons other than plaintiff, and otherwise than by marketing the same through plaintiff, to plaintiff's great and irreparable injury and damage by reason of the fact that the obligation of all similar contracts between the plaintiff association and its members will thereby be relaxed, and the business of co-operative marketing in-

volved in the organization and operation of the said plaintiff association will' thereby be totally destroyed, and by reason of the fact that the damages resulting therefrom to the said plaintiff association and its several members will be practically undeterminable in money value; and that plaintiff has no adequate remedy at law in the premises."

In Oregon Growers' Ass'n. v. Lentz, supra, it was said:

"As stated, the plaintiff is a co-operative marketing association and is not conducted for profit. Its members are composed exclusively of growers of horticultural and agricultural products. The defendant is himself a member of the association, and has contractual relations with it. These contracts are all similar in terms and constitute the association as the agent of the members to dispose of and market their products for the mutual benefit of the members and without profit to the association. Its success, therefore, and the benefits to be derived by the members thereof, is wholly dependent upon the performance, by all of the contracting parties, with the terms and conditions of their respective contracts. In order to carry out the objects and purposes for which it was organized, it is necessary for the association to enter into contracts for the disposal of the products of its members. Before it can safely make such contracts, it must be assured that it will obtain the products contracted for. It must also be able to form a reasonable estimate, in advance, of the amount of products which will be grown on the acreage stipulated, and maintain a sufficient organization and force to prepare the same for market. It is also necessary to secure the capital or credit required to discharge its obligations to the growers and to conduct and carry on its business. The perishable nature of the products handled, the uncertainty of the market conditions and prices, its inability to buy these products from nonmembers, and the limited time in which its business for each season must be conducted and completed, makes it essential that each member of the association should perform his contract according to its terms. From these considerations, it must be obvious that an action at law to recover the stipulated damages would not afford to the plaintiff a full, adequate, and complete remedy for the wrong done to the association, and indirectly to its members by a member's breach of his contract."

In Texas Farm Bureau Cotton Ass'n. v. Stovall, supra, the court said:

"Aside from the statute, the plaintiff in error, because of the contract and the nature of its business as a co-operative concern without capital stock, would be entitled to equitable relief. Oregon Growers' Co-operative Ass'n. v. Lentz [107 Or. 561] 212 P. 811; Washington Cranberry Ass'n. v. Moore, 117 Wash. 430, 201 P. 773, 204 P. 811 [25 A. L. R. 1077]; Grant County Board v. Allphin, 152 Ky. 280, 153 S. W. 417; Phez v. Salem Fruit Union, 103 Or. 514, 201 P. 222, 205 P. 970 [25 A. L. R. 1090]; Owen County Society v. Brumback, 128 Ky. 137, 107 S. W. 710; Tobacco Growers' Co-operative Ass'n. v. Jones [175 N. C. 265] 117 S. E. 174 [33 A. L. R. 231]. * * *.

"The Court of Civil Appeals expresses the view that specific performance could not be awarded against a member, because it would necessarily require constant supervision of the court, covering a long period of time, involving a series of acts, and because the court would be confronted with the possible problem of pursuing the party against whom the plea is made from place to place, etc. The answer to this is that the rule stated is a rule of decision, and not a limitation of the jurisdiction of a court of equity. 3 Elliott on Contracts, § 2322. In addition, the statute has authorized the remedy, and the contract here involved is within the statute, which must control. Vernon's Texas Civil Statutes 1922 Supplement, art. 14½s. Besides, a court of equity would not meet with any very serious difficulty in requiring the average owner to deliver his cotton after it was ginned."

In the Oregon case in 212 Pacific and the Texas case in 253 Southwestern last cited, both specific performance and injunction were considered as appropriate remedies to enforce the performance of such contracts. We think that the reasons that the court gave in those cases for sustaining these remedies are sound, and we take the same view of the matter.

The judgment is therefore reversed, with instructions to the trial court to overrule the demurrer to the first amended complaint, and for further proceedings not inconsistent with this opinion, and it is so ordered.

PARKER, C. J., and WATSON, J., concur.